UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LIBERTY MUTUALINSURANCE COMPANY

                              Plaintiff,                     07 CV 11292 (JFK)

   - against -                            **DECLARATION OF**
                                          **ANDREW M. PREMISLER**

TRAVELERS PROPERTY CASUALTY COMPANY
OF AMERICA f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,

                              Defendant.

    **ANDREW M. PREMISLER, ESQ.**, pursuant to 28 U.S.C. § 1746, declares as follows:

    1.     I am a partner with the law firm of Lazare Potter Giacovas & Kranjac, LLP, attorneys for Defendant Travelers Property Casualty Company of America ("Travelers") f/k/a The Travelers Indemnity Company of Illinois.  I submit this declaration in further support of Travelers' motion to dismiss the complaint in lieu of an answer and in opposition to Plaintiff's request for a determination that 475 Ninth Avenue Associates, LLC ("475 Ninth") and VJB Construction Corp. ("VJB") are additional insureds on the Travelers Policy.

    2.     Travelers' arguments are set forth in detail in the accompanying reply memorandum of law and will not be repeated here.  Listed below are descriptions of the exhibits referred to in Travelers' reply memorandum and attached to this declaration.

| | |
|---|---|
| Exhibit "A" | The April 13, 2004 letter from Ryan, Devereaux & Conlon, LLP to R&J Construction; |
| Exhibit "B" | Travelers' May 11, 2004 disclaimer letter; |
| Exhibit "C" | Excerpts of the September 28, 2007 deposition transcript of 475 Ninth's Stephen Benjamin in the state action; |

Exhibit "D"          The October 20, 2003 Summons and Complaint in the state action; [1]

Exhibit "E"          Excerpts of the April 5, 2005 deposition transcript of VJB Construction Corp.'s Edward Venezia.

3.      Thus, based upon the above and for the reasons stated in the accompanying papers, Travelers respectfully asks the Court to dismiss the complaint in its entirety.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 1, 2008 in New York, New York.


                                        s/ Andrew M. Premisler
                                        Andrew M. Premisler, Esq.

---

[1]     On October 28, 2004, the state court severed the third-party action from the underlying first-party action only for the purposes of trial.  (02/22/08 Potashner Aff., Ex "7").  The matters, however, remained consolidated for discovery and motion practice.  Although there was no written order severing the second third-party action, the Court verbally directed that said action be severed only for the purposes of trial.  Again, all pre and post trial proceedings on all of the state claims remained consolidated.  In fact, following the trial, all parties on all of the actions appeared before the state court in connection with 475 Ninth, VJB and Liberty's motion to reargue the August 2007 Order.  (01/22/08 Prem. Dec. at ¶ 2, Exh. "Q").  It was at this time, that the state court ordered that the "entire case" -- e.g., all of the coverage claims -- be dismissed.  (01/22/08 Prem. Dec. at ¶ 2, Exh. "Q"[pp. 37, 43-44).  Moreover, although the state action was settled on the record, Liberty (upon information and belief) has never paid any portion of the settlement amount to the underlying plaintiffs.

Exhibit A

# RYAN, DEVEREAUX & CONLON, LLP

### 39 BROADWAY, SUITE 910
### NEW YORK, NEW YORK 10006
### (212) 785-5959/Fax No. (212) 785-4487

Kieran J. Conlon
Michael J. Devereaux
William F. Ryan

Stewart A. McMillan**
Elizabeth E. Malang
Janet R. Abrams*
Stephen E. Kwan

www.rdclawyers.com

Of Counsel:
Matthew T. Brown

*Admitted NY, NJ
**Admitted NY, CT

April 13, 2004

<u>Via Fax (516) 432-6322/By-Mail</u>

Joe Ferrara, Vice President
R & J CONSTRUCTION
4435 Austin Boulevard
Island Park, NY 11561

|  | Re: | *Comprehensive General Liability Insurance* |
|---|---|---|
|  | *Insurer* | : *Travelers Indemnity Company* |
|  | *Insured* | : *R & J Construction Corp.* |
|  | *Additional Insured* | : *VJB Construction Corp.* |
|  | *Additional Insured* | : *Kajima Construction/VJB LLC* |
|  | *Policy No.* | : *CO963K2686TIL02* |
|  | *Policy Effective Dates* | : *01/01/02 - 01/01/03* |
|  | *Policy Limits* | : *$1,000,000/$2,000,000* |
|  | *Claimants* | : *George Santoli, Stacey Santoli* |
|  | *Court/Venue* | : *Supreme, New York County* |
|  | *Index No.* | : *118596/03* |
|  | *Our File No.* | : *MLi70014* |

Dear Mr. Ferrara:

This is our second letter. By letter dated February 23rd, we notified you that we are attorneys representing VJB Construction Corp. ("VJB"), against a personal injury lawsuit started by the plaintiffs George Santoli and Stacey Santoli. The plaintiff George Santoli alleged that he was caused to trip and fall due to negligence. You were required to keep the premises clear of materials, debris and electrical cords.

*We requested you to urgently notify your CGL carrier. This request was and remains urgent and serious* (emphasis added). We never heard form you. This is our second request.

VJB hereby again demands that you do the following as soon as possible to protect VJB and yourself by ensuring insurance applies:

Joe Ferrara, Vice President
April 13, 2004
Page 2

- notify your insurer Travelers Indemnity Company to immediately step-in to defend VJB against the plaintiff's herein lawsuit

- copy the undersigned on that notice to your insurer

- provide the name of the contact person for your communications with your insurer, including address, telephone and fax numbers

- provide a true and accurate copy of your insurance policy number CPP3113891 with your insurer

- that you step-in to defend and indemnify VJB against the plaintiff's herein lawsuit

- that if you are represented by counsel, that you provide the name, address, telephone and fax number of your attorneys

R&J Construction ("R&J") represented that they purchased a comprehensive general liability (CGL) insurance policy number CO963K2686TIL02 from Travelers Indemnity Co. R&J also represented that VJB was an additional insured on policy number CO963K2686TIL02. R&J also represented the following:

| | |
|---|---|
| CGL insurance policy number | : CO963K2686TIL02 |
| Policy effective dates | : 01/01/03 – 01/01/04 |
| Policy Lts | : $1 million/$2 million |
| Insured | : R&J Construction |
| Additional Insured | : VJB |
| Additional Insured | : Kajima Construction/VJB LLC |

R&J made these representations by and through Allianceplus, Inc. Please confirm that these representations were true and accurate. A copy of your Certificate of Liability Insurance was enclosed in our first letter.

R&J entered into a Subcontract dated January 9, 2002 with the construction manager Kajima/VJB Construction Services LLC to do electrical work on the Project at 475 9th Avenue (the "Subcontract"). By Subcontract, R&J agreed to maintain CGL insurance at Exhibit B(B) of the Subcontract as follows:

B)    *Commercial General Liability Insurance* with the following features:

- Occurrence Coverage under the Commercial General Liability ISO form.

- Limits not less than          $2,000,000 General Aggregate/Per Project
                               $2,000,000 products/completed operations

     aggregate

                               $2,000,000 Each Occurrence

Joe Ferrara, Vice President
April 13, 2004
Page 3

$1,000,000 personal injury & advertising injury
$     5,000 Medical Expense *(Any one person)*

- Owner, Architect and others are additional insured as required in the Contract Documents. Please include the following as an additional insured:

- Kajima Construction/VJB LLC

- VJB Construction Corp. – 200 West 56th St., New York, NY 10019

- Kajima International and all its subsidiaries (Kajima Construction Services Inc., Kajima Associates Inc., Kajima Associates/Architects, A Professional Corporation).

- Other insurance clause to be deleted and insurance is to apply on a primary basis for additional insured. Rights of subrogation against additional insured are waived and evidence of waiver shall be in a form equivalent in all respects to ISO 1984 form CG 24 04 11 85. <u>A copy of the policy endorsement for waiver of subrogation must be submitted with the insurance certificate prior to mobilization on the site.</u>

R&J agreed, among other things, to keep aisles, stairways, fire exits and doorways clear of materials, debris and electrical cords at Exhibit F §23k of the Subcontract as follows:

k)    Aisles, stairways, fire exits and doorways must be kept clear of materials, debris and electrical cords.

*Accordingly, please comply with the demands as soon as possible. It is urgent and serious* (emphasis added).

Thank you for your kind attention and cooperation.

Truly yours,

Michael J. Devereaux
RYAN, DEVEREAUX & CONLON, LLP

MJD:khd

cc:    Allianceplus, Inc. (via fax)
Travelers Indemnity Co. (via fax)

Exhibit B



Joanne Candela, Sr. Technical Specialist

Travelers Property Casualty
One Whitehall St., 2nd Fl.
New York, NY 10004

212-859-3257
212-859-3297 - fax

May 11, 2004


Ryan, Devereaux & Conlon, LLP
39 Broadway, Suite 910
New York, NY 10006

Attn: Michael J. Devereaux

Re: Insured: R&J Construction
    Claimant: George Santoli
    Date of Loss: 4/7/03
    Our File #: B6X5361
    Your File #: MLi70014
    Caption: George Santoli and Stacey Santoli v. 475 Ninth Avenue Associates LLC, VJB
               Construction 475 9th Avenue LLC, VJB Construction Corp., Spieler & Ricca
               Electrical Co., Inc. and Kajima Development Corporation

Dear Mr. Devereaux:

This letter will serve to acknowledge receipt of your correspondence with regard to the above-captioned matter and will advise you of the Travelers Property Casualty Company of America's (Travelers) determination that it has no duty to defend and/or any obligation to indemnify VJB Construction Corporation in this matter pursuant to the Commercial General Liability policy issued by Travelers to R&J Construction Corporation under policy number DT88JCO-963K2686 or the policy period 1/1/03 to 1/1/04 (the policy).

The complaint captioned above alleges George Santoli was injured due to negligence and violations of the New York State Labor Law by all of the defendants.

The applicable section of the COMMERCIAL GENERAL LIABILITY COVERAGE FORM, GNC0010198 of the policy contains the following Insuring Agreement and Conditions Section, which provides, in relevant part:

### SECTION I-COVERAGES
### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.    **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

        \*             \*          \*

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the coverage territory", and

        (2)  The "bodily injury" or "property damage" occurs during the policy period.

## SECTION V - DEFINITIONS

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or advertising injury" to which this insurance applies are alleged.  "Suit" includes:

    a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

"Your work" means:

    a.  Work or operations performed by you or on your behalf; and

    b.  Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

    a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    b.  The providing of or failure to provide warnings or instructions.

After a review of the policy it has been determined that VJB Construction Corp. is not a Named Insured and does not qualify as an insured pursuant to the policy issued to R&J Construction Corp..

The policy also contains BLANKET ADDITIONAL INSURED ENDORSEMENT CGD2100798, which states, in relevant part:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY CONTRACTORS COVERAGE PART

1.  WHO IS AN INSURED (Section II) is amended to include any person or organization you are required by written contract to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period and executed prior to the occurrence of any loss.

2.  The insurance provided to the additional insured is limited as follows:

(a)  The person or organization is only an additional insured with respect to liability arising out of "your work" for that additional insured.

(b)  In the event that the limits of liability stated in the policy exceed the limits of liability required by the written contract or written agreement, the insurance provided by this endorsement shall be limited to the limits of liability required by the written contract.  This endorsement shall not increase the limits stated in Section III-LIMITS OF INSURANCE.

(c)  The insurance provided to the additional insured does not apply to "bodily injury, "property damage", "personal injury" or "advertising injury" arising out of an architect's, engineer's or surveyor's rendering of or failure to render any

professional services including:

I The preparing, approving or failing to prepare or approve maps, shop
drawings, opinions, reports, surveys, field orders, change orders, or drawings
and specifications; and

II. Supervisory or inspection activities performed as part of any related
architectural or engineering activities.

(d) Except when required by written contract or written agreement, the coverage
provided to the additional insured by this endorsement does not apply to "bodily
injury" or "property damage" arising out of acts or omissions of the additional
insured other than in connection with the general supervision of "your work".

(e) This insurance does not apply to "bodily injury" or "property damage"
arising out of "your work" included in the "products-completed operations
hazard" unless you are required to provide such coverage by written contract or
written agreement and then only for the period of time required by the contract
and in no event beyond the expiration date of the policy.

3. Subpart (1)(a) of the Pollution exclusion under Paragraph 2., Exclusions of Bodily
Injury and Property Damage Liability Coverage (Section I-Coverages) does not apply
to you if the "bodily injury" or "property damage" arises out of "your work"
performed on premises which are owned or rented by the additional insured at the
time "your work" is performed.

4. Any coverage provided by this endorsement to an additional insured shall be
excess over any other valid and collectible insurance available to the additional
insured whether primary, excess, contingent or on any other basis unless a written
contract or agreement specifically requires that this insurance apply on a primary or
contributory basis.

5. As soon as practicable, each additional insured must give us prompt notice of any
"occurrence" which may result in a claim, forward all legal papers to us, cooperate in
the defense of any actions, and otherwise comply with policy conditions.

After a review of the additional insured endorsement it has been determined VJB Construction
Corporation does not qualify as an additional insured.

In order to trigger coverage under the Blanket Additional Insured Endorsement, there must be a written contract or agreement executed prior to the occurrence of any loss indicating who will be named as additional insured. The liability must arise out of the named insured's work for the additional insured and the endorsement excludes coverage for "bodily injury" or "property damage" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work".

Based on section 2a of the Blanket Additional Insured endorsement, insurance provided to the additional insured is with respect to liability arising out of "your work" for that additional Insured. R&J Construction was not performing work for VJB Construction Corporation pursuant to the contract. Coverage is denied for this reason.

Furthermore, should it be determined that VJB Construction Corporation qualifies as an additional insured, which Travelers expressly denies, then all of the allegations of negligent, reckless and careless conduct in the complaint seek recovery for "bodily injury" arising out of the acts or omissions of VJB Construction Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement.

Moreover, should it be determined that VJB Construction Corporation qualifies as an additional insured, which Travelers expressly denies, then the Labor Law 200 claim seeks recovery for "bodily injury" arising out of the acts or omissions of VJB Construction Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement

Additionally, should it be determined that VJB Construction Corporation qualifies as an additional insured, which Travelers expressly denies, then the Labor Law 241 claim seeks recovery for "bodily injury" arising out of the acts or omissions of VJB Construction Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement

Should it be determined that VJB Construction Corporation qualifies as an additional insured under the policy issued to R&J Construction, which Travelers expressly denies, then the coverage would be excess over any other valid and collectible insurance available to the additional insureds as indicated in the Blanket Additional Insured Endorsement.

Travelers also refers you to the Conditions Portion of the policy which states in relevant part:

### SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS
2.     **Duties in the Event of Occurrence, Claim or Suit**

*          *          *

   b.  If a claim is made or "suit" is brought against any insured, you must:

      (1)  Immediately record the specifics of the claim or "suit" and the date received; and

      (2)  Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c.  You and any other involved insured must:

      (1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2)  Authorize us to obtain records and other information;

      (3)  Cooperate with us in the investigation or settlement of the claim or defense against "suit"; and

      (4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d.  No insureds will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

Should it be determined that VJB Construction Corporation qualifies as additional insured on the policy, which Travelers expressly denies, then VJB Construction Corporation breached the policy conditions. As a condition precedent to coverage under the Blanket Additional Insured Endorsement, each additional insured must give us prompt notice of any "occurrence" which may result in a claim, forward all legal papers to us, cooperate in the defense of any actions, and otherwise comply with policy conditions. The alleged incident occurred on April 7, 2003. Travelers' first notice of a request for coverage by VJB Construction Corporation under the R&J Construction Corporation policy was a letter dated April 13, 2004 from attorneys Ryan, Devereaux & Conlon, LLP and received by Travelers on April 14, 2004. Notice was given to Travelers approximately one year after the date of loss and was, therefore, untimely. Coverage is

denied to VJB Construction Corporation for this reason.    Moreover, the original Summons &
Complaint filed against VJB Construction Corporation is dated October 20, 2003 and VJB
Construction Corporation received the Summons & Complaint on or about October 20, 2003.
The requirements of the Blanket Additional Insured Endorsement indicate each additional insured
must give prompt notice of an "occurrence" which may result in a claim, forward all legal papers
to us, cooperate in the defense of any actions, and otherwise comply with policy conditions. As
stated the legal papers sent to Travelers by Ryan, Devereaux & Colon were not received until
April 14, 2004. VJB Construction Corporation breached the notice conditions under the Blanket
Additional Insured Endorsement and coverage is, therefore, denied.

Additionally, as indicated in the policy conditions, if a claim is made or "suit" is brought against
any insured, you must immediately record the specifics of the claim or "suit" and the date received
and notify us as soon as practicable. As previously stated, the original lawsuit filed against VJB
Construction Corporation is dated October 20, 2003 and VJB Construction Corporation received
the Summons & Complaint on or about October 20, 2003.    Travelers did not receive a request
by VJB Construction Corporation for coverage under the R&J Construction policy until April 14,
2004. VJB Construction Corporation breached the policy conditions as stated in Section IV,
2b.(1) and (2), therefore, coverage is denied to VJB Construction Corporation.

Also, as indicated in the conditions, you must see to it that we receive written notice of the claim
or "suit" as soon as practicable. You and any other involved insured must immediately send us
copies of any demands, notices, summonses or legal papers received in connection with the claim
or "suit"; authorize us to obtain records and other information; cooperate with us in the
investigation or settlement of the claim or defense against "suit"; and assist us, upon our request,
in the enforcement of any right against any person or organization which may be liable to the
insured because of injury or damage to which this insurance may also apply. Moreover, no
insureds will, except at that insured's own cost, voluntarily make a payment, assume any
obligation, or incur any expense, other than for first aid, without our consent.    As stated
previously, the Summons & Complaint is dated October 20, 2003. Travelers did not receive a
request from VJB Construction Corporation for coverage under the R&J Construction policy
until April 14, 2004. VJB Construction Corporation breached the policy conditions as stated in
Section IV, c., (1), (2), (3), (4) and d. of the policy and coverage is therefore, denied to VJB
Construction Corporation.

Although Ryan, Devereaux & Conlon has not requested coverage for 475 Ninth Avenue LLC,
VJB Construction 475 9th Ave., LLC and/or Kajima Development Corporation in their letter of
April 13, 2004, we will treat your letter as if you did and accordingly, Travelers position as it
relates to these entities is set forth below.

As to Kajima Development Corporation and VJB 9th Avenue Associates LLC, there is no
indication there is a written contract requiring these entities be named as additional insureds as
required in the Blanket Additional Insured endorsement. Coverage is denied for this reason.

Based on section 2a of the Blanket Additional Insured endorsement, insurance provided to the additional insured is with respect to liability arising out of "your work" for that additional Insured. R&J Construction was not performing work for 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation pursuant to the contract. Coverage is denied for this reason.

Furthermore, should it be determined that 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation qualify as additional insureds, which Travelers expressly denies, then all of the allegations of negligent, reckless and careless conduct in the complaint seek recovery for "bodily injury" arising out of the acts or omissions of 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement.

Moreover, should it be determined that 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation qualify as additional insureds, which Travelers expressly denies, then the Labor Law 200 claim seeks recovery for "bodily injury" arising out of the acts or omissions of 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement

Additionally, should it be determined that 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation qualify as  additional insureds, which Travelers expressly denies, then the Labor Law 241 claim seeks recovery for "bodily injury" arising out of the acts or omissions of 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation. As indicated the Blanket Additional Insured endorsement does not apply to "bodily injury" arising out of acts or omissions of the additional insured other than in connection with the general supervision of "your work". As to those allegations there is no coverage pursuant to 2. d of the Blanket Additional Insured endorsement

Should it be determined that 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation qualify as an additional insureds under the policy issued to R&J Construction, which Travelers expressly denies, then the coverage would be excess over any other valid and collectible insurance available to the additional insureds as indicated in the Blanket Additional Insured Endorsement.

Should it be determined that 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation qualify as additional insured on the policy, which Travelers expressly denies, then 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation breached the policy conditions. As a condition precedent to coverage under the Blanket Additional Insured Endorsement, each additional insured must give us prompt notice of any "occurrence" which may result in a claim, forward all legal papers to us, cooperate in the defense of any actions, and otherwise comply with policy conditions. The alleged incident occurred on April 7, 2003. Travelers' first notice of a request for coverage by 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation under the R&J Construction Corporation policy was a letter dated April 13, 2004 from attorneys Ryan, Devereaux & Conlon, LLP and received by Travelers on April 14, 2004.. Notice was given to Travelers approximately one year after the date of loss and was, therefore, untimely. Coverage is denied to 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation for this reason.

Additionally, as indicated in the policy conditions, if a claim is made or "suit" is brought against any insured, you must immediately record the specifics of the claim or "suit" and the date received and notify us as soon as practicable. As previously stated, the original lawsuit filed against 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation is dated October 20, 2003 and 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation received the Summons & Complaint on or about October 20, 2003. Travelers did not receive a request by 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation for coverage under the R&J Construction policy until April 14, 2004. 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation breached the policy conditions as stated in Section IV, 2b.(1) and (2), therefore, coverage is denied to 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation.

Also, as indicated in the conditions, you must see to it that we receive written notice of the claim or "suit" as soon as practicable. You and any other involved insured must immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit"; authorize us to obtain records and other information; cooperate with us in the investigation or settlement of the claim or defense against "suit"; and assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply. Moreover, no insureds will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent. As stated previously, the Summons & Complaint is dated October 20, 2003. Travelers did not receive a request from 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation for coverage under the R&J Construction policy until April 14, 2004. 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation breached the policy conditions as stated in Section IV, c., (1), (2), (3), (4) and d. of

the policy and coverage is therefore, denied to 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation.

Finally, please be advised that Travelers has not received any notice of the accident and/or claims asserted against you in the underlying suit from any injured person or other claimant. As a result of the failure of any injured person or other claimant to provide such notice Travelers disclaims coverage for this reason as well.

Consequently, Travelers has no duty to defend and/or any obligation to indemnify VJB Construction Corp., 475 Ninth Avenue Associates LLC, VJB Construction 475 9th Avenue LLC, and/or Kajima Development Corporation in this matter under the Commercial General Liability policy issued to R&J Construction.

This correspondence is not intended to be, nor shall it be construed as an exhaustive listing or discussion of policy terms, conditions, exclusions or endorsements, facts or circumstances, or principles of insurance law which may further provide a basis to preclude coverage under Travelers policy in this matter. Travelers' reserves the right to supplement its declination should information, not currently known to Travelers indicate the applicability of additional grounds. We refer you to the specific insurance policies for a comprehensive review of coverage; including policy terms, conditions, exclusions, and endorsements.

If there are any questions regarding this matter, please feel free to contact the undersigned at 212-859-3257.

Sincerely,


Joanne Candela
Senior Technical Specialist

cc: Allianceplus, Inc.
    1050 Franklin Avenue, Suite 200
    Garden City, NY 11530

    R&J Construction Corp.
    4435 Austin Boulevard
    Island Park, NY 11558

    475 Ninth Avenue Associates LLC
    c/o Dermot Meridian LLC
    1775 Broadway, Suite 730
    New York, NY 10022

**Page 11 of 11**
**May 11, 2004**
**Santoli v. R&J**


cc:  VJB Construction 475 9th Avenue LLC
     Altieri, Kushner, Muccio & Frind
     Attn: Dennis Frind
     60 East 42nd Street
     New York, NY 10165

     VJB Construction Corp.
     c/o CT Corporation System
     111 8th Avenue
     New York, NY 10011

     Kajima Development Corporation
     Latham & Watkins
     Attn: Jamie Hisiger
     885 Third Avenue
     New York, NY 10022

     Hach & Rose, LLP
     185 Madison Avenue, 8th Fl.
     New York, NY 10016

     Zeitlin & Dechiara, LLP
     801 2nd Ave., 17th Fl.
     New York, NY 10017

Exhibit C

## Page 1

(1) SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
(2) -------------------------------------------x
    GEORGE SANTOLI and STACEY SANTOLI,
(3)                         Plaintiffs,
                                            Index No.
(4)       -against-                         118596/03
(5) 475 NINTH AVENUE ASSOCIATES, LLC, VJB
    CONSTRUCTION 475 9th Avenue LLC, VJB
(6) CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL
    CO. INC. and KAJIMA DEVELOPMENT CORPAORATION,
(7)                         Defendants.
    -------------------------------------------x
(8) VJB CONSTRUCTION CORP.; and LIBERTY
    INTERNATIONAL UNDERWRITERS a/s/o VJB
(9) CONSTRUCTION CORP.
                    Third-Party Plaintiffs,
(10)      -against-
(11) R& J CONSTRUCTION CORP.; TRAVELERS INDEMNITY
     COMPANY; TRAVELERS INDEMNITY COMPANY OF AMERICA;
(12) TRAVELERS INDEMNITY COMPANY CONNECTICUT;
     REPUBLIC FRANKLIN INSURANCE COMPANY; UTICA
(13) NATIONAL INSURANCE COMPANY OF TEXAS; UTICA
     NATIONAL INSURANCE GROUP UTICA MUTUAL INSURANCE
(14) COMPANY; UTICA NATIONAL ASSURANCE COMPANY;
     REGIONAL SCAFFOLDING and HOISTING CO., INC.,
(15)                    Third-Party Defendants.
(16) -------------------------------------------x
(17)                    September 28, 2007
                        11:38 a.m.
(18)
(19)      Deposition of STEPHEN BENJAMIN, pursuant
     to Order, at the offices of Dermot, 320 West
(19) 57th Street, 5th floor, New York, New York
     10019, before Stephen Kleinman, a Notary Public
(20) within and for the State of New York.
(21)
(22)
(23)         ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
(24)             New York, New York 10022
                     212-750-6434
(25)                 REF: 85455

## Page 2

(1) A P P E A R A N C E S :
(2)
(3) MICHAEL J. DEVEREAUX, ESQ.
(4)     Attorneys for Defendant and
(5)     Third-Party Plaintiff 475 Ninth Avenue
(6)     Associates
(7)     39 Broadway suite 910
(8)     New York, New York 10006
(9)
(10) LAZARE POTTER GIACOVAS & KRANJAC, LLP
(11)     Attorneys for Second Third-Party
(12)     Defendant Travelers Insurance Company
(13)     950 Third Avenue
(14)     New York, New York 10022
(15) BY:   ANDREW M. PREMISLER, ESQ.
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1) ------------------ I N D E X ------------------
(2) WITNESS: STEPHEN BENJAMIN
(3) EXAMINATION BY                                    PAGE
(4) MR. PREMISLER                                       5
(5)
(6) ---------------- E X H I B I T S ----------------
(7) DEFENDANT'S   DESCRIPTION                         PAGE
(8) Exh. A, B     Certificates of                      41
(9)               liability insurance
(10) Exhibit C    Affidavit                            47
(11) Exhibit D    Supervisor's accident/incident       57
(12)              report
(13) Exhibit E    Summons                              60
(14) Exhibit F    Verified answer                      70
(15) Exhibit G    May 11, 2004 letter                  83
(16)
(17) ------------ INFORMATION REQUESTS ------------
(18) DIRECTIONS (DI):    15, 91
(19) INSERT:             None
(20) RULINGS (RL):       None
(21) REQUESTS (RQ):      41
(22) CERTIFIED (CE):     None
(23) MOTIONS (MO):       None
(24)
(25)

## Page 4

(1)            S T I P U L A T I O N S
(2)
(3)      IT IS HEREBY STIPULATED AND AGREED
(4) by and between counsel for the respective
(5) parties hereto, that all rights provided
(6) by the CPLR including the right to object
(7) to any question except as to the form or
(8) to move to strike any testimony at this
(9) examination before trial shall not be a
(10) bar or waiver to make such motion at, and
(11) is reserved for the trial of this action.
(12)      IT IS FURTHER STIPULATED AND AGREED
(13) by and between counsel for the respective
(14) parties hereto that this examination be
(15) sworn to by the witness before a Notary
(16) Public other than the Notary Public
(17) before whom this examination was begun,
(18) but the failure to do so or to return the
(19) original of the examination to counsel,
(20) shall not be deemed a waiver of the
(21) rights provided by Rule 3116 and Rule
(22) 3117 of the CPLR and shall be controlled
(23) thereby.
(24)
(25)

---

Page 5

(1)

(2) S T E P H E N   B E N J A M I N,  called as

(3) a witness, having been duly sworn

(4) by a Notary Public, stated his

(5) business address as 320 West 57th

(6) Street, 5th floor, New York, New

(7) York 10019, was examined and

(8) testified as follows:

(9)

(10)

(11) EXAMINATION BY

(12) MR. PREMISLER:

(13)    Q.   Good morning.

(14)    A.   Good morning.

(15)    Q.   My name is Andrew Premisler. I

(16) am a lawyer with the law firm of Lazare

(17) Potter Giacovas & Kranjac and we represent

(18) the second third-party defendant in this

(19) lawsuit, which I am going to refer to today

(20) as Travelers. It is an insurance company.

(21)    We are being sued. There are a

(22) few other actions involved here today, which

(23) are not really at issue today, but the one

(24) that we are here today for is 475 Ninth

(25) Avenue Associates, Inc. against Travelers,

---

Page 6

(1)

(2) okay?

(3)    A.   Okay.

(4)    Q.   I am going to be asking you a

(5) bunch of questions about that lawsuit and the

(6) facts and circumstances alleged therein.

(7)    There is a court reporter

(8) sitting here to my right. He is going to be

(9) taking down everything that you and I say.

(10) So I just ask, in answering my questions,

(11) that you make all your response verbal. Try

(12) to answer with a yes or no, no shakes of the

(13) head, try to keep everything verbal, try to

(14) refrain from using hand gestures and the

(15) like. Just remember that the court reporter

(16) has to take down everything that we say.

(17)    Also, please try to keep your

(18) voice up. It is a small room. So that

(19) shouldn't be a problem.

(20)    If you have any questions,

(21) problems, concerns, you need to take a break

(22) at any time, just let me know. If you need

(23) to use the restroom or you want to take a

(24) break for lunch or whatever, just let me know

(25) and we will take a break.

---

Page 7

(1)

(2)    If there is any part of my

(3) question or anything that you don't

(4) understand, please let me know. I will

(5) rephrase the question so you and I are both

(6) on the same page with the questions and the

(7) answers, okay?

(8)    A.   Okay.

(9)    Q.   Mr. Benjamin, can I have your

(10) full name and address?

(11)    A.   My work address or home

(12) address?

(13)    Q.   Let's start with your work

(14) address.

(15)    A.   Stephen Benjamin, middle

(16) initial N. The work address is --

(17)    MR. DEVEREAUX: Just the work

(18) address. I will take a subpoena on

(19) his behalf. So there is no reason for

(20) the home address.

(21)    A.   Our work address 320 West 57th

(22) Street, New York, New York 100119.

(23)    Q.   That is the office that we are

(24) in today?

(25)    A.   Correct.

---

Page 8

(1)

(2)    MR. PREMISLER: And counsel is

(3) going to accept a subpoena on his

(4) behalf?

(5)    MR. DEVEREAUX: That's fine.

(6)    Q.   Are you currently employed?

(7)    A.   Yes, with The Dermot Company.

(8)    Q.   Is that the official name of

(9) your employer, The Dermot Company?

(10)    A.   Yes.

(11)    Q.   What is your current position

(12) at The Dermot Company?

(13)    A.   I am a vice president.

(14)    Q.   And just generally as vice

(15) president, what are your job duties and

(16) responsibilities?

(17)    A.   I am generally the person in

(18) charge of our development activities in New

(19) York City.

(20)    Q.   When you say "development

(21) activities," what do you mean by that?

(22)    A.   We are part -- part of our

(23) business is focused on the development of the

(24) real estate in New York City, and I am

(25) responsible for those activities.



Page 9

(1)
(2)    Q.    When you say "development of
(3) real estate," you mean construction,
(4) renovation, something else?
(5)    A.    All of the above, but I am
(6) responsible for our financing and general
(7) project management.
(8)    Q.    Are you responsible for general
(9) project management of all of the Dermot
(10) Company's properties in New York City?
(11)    A.    Yes.
(12)    Q.    Okay. How long have you been
(13) the vice president?
(14)    A.    Since 2001.
(15)    Q.    Have your job duties and
(16) responsibilities as a vice president of The
(17) Dermot Company remained the same from 2001
(18) until today?
(19)    A.    Materially.
(20)    Q.    What were some of the
(21) immaterial changes to your duties and
(22) responsibilities --
(23)    MR. DEVEREAUX:  Objection.
(24)    Q.    -- generally speaking, over
(25) that time?

Page 10

(1)
(2)    MR. DEVEREAUX:  Objection. You
(3) can go ahead and answer it.
(4)    A.    As our business grows, we
(5) continue to do a lot of different things I am
(6) a partner in the firm as well and my
(7) responsibilities adapt you to, you know, what
(8) we are investing in.
(9)    Q.    What type of business
(10) organization is The Dermot Company?
(11)    MR. DEVEREAUX:  Objection. Go
(12) ahead.
(13)    Q.    Do you understand what I mean
(14) when I say "business organization"?
(15)    A.    No.
(16)    MR. DEVEREAUX:  It is a legal
(17) question.
(18)    MR. PREMISLER:  Let me rephrase
(19) the question.
(20)    MR. DEVEREAUX:  Okay.
(21)    Q.    Do you know if The Dermot
(22) Company is a corporation, a partnership, an
(23) LLC, an LLP or something else?
(24)    A.    I don't know exactly it is. I
(25) believe it is an LLC.

Page 11

(1)
(2)    Q.    You mentioned that you are a
(3) partner in the firm?
(4)    A.    Yes.
(5)    Q.    Does that mean you are a
(6) partner in The Dermot Company?
(7)    A.    I think a partnership in a
(8) series of LLCs that invest directly in our
(9) real estate. I am not an owner of the entity
(10) called The Dermot Company for which I am a
(11) vice president. That entity is wholly owned
(12) by our managing partner, a gentlemen by the
(13) name of William Dickey.
(14)    Q.    Let's try to keep just to this
(15) lawsuit.
(16)    The entity that is suing here
(17) is 475 Ninth Avenue Associates, LLC?
(18)    A.    Correct.
(19)    Q.    What is your relationship with
(20) that company?
(21)    A.    The managing member of that
(22) entity is an entity called Dermot Meridian,
(23) LLC. Dermot Meridian was the managing member
(24) in that LLC with an investor that is
(25) affiliate of a pension fund that is called

Page 12

(1)
(2) The Building Investment Trust. Dermot
(3) Meridian, LLC was in turn, is in turn, is
(4) still exists, though the activities are wound
(5) down Dermot Meridian, LLC was in turn owned
(6) by two LLCs, one an affiliate of Dermot
(7) Property Associates and the other an entity
(8) called Meridian Partners, LLC. I am the
(9) managing member of Meridian Partners, LLC and
(10) as such as was responsible, as the managing
(11) member, for the activities of 475 Ninth
(12) Avenue during the time that we were engaged
(13) in developing the project that we are talking
(14) about.
(15)    Q.    You mentioned that the managing
(16) member of 475 Ninth Avenue Associates, LLC
(17) was Dermot Meridian LLC and you also mention
(18) the Building Investment Trust?
(19)    A.    Yes.
(20)    Q.    Are those the only two members
(21) of 475 Ninth --
(22)    A.    Yes.
(23)    Q.    -- Avenue Associates, LLC?
(24)    A.    Yes.
(25)    Q.    And the Building Investment



Page 13

(1)
(2)   Trust, that is not an affiliate or related
(3)   company with Dermot Meridian, LLC or any of
(4)   its other members' partners?
(5)      A.   No.
(6)      Q.   You mentioned that Dermot
(7)   Meridian, LLC has two members and The Dermot
(8)   Company Property?
(9)      A.   Associates.
(10)     Q.   Dermot Property Associates and
(11)  Meridian Partners, LLC?
(12)     A.   **And just to be specific The**
(13)  **Dermot Property Associates is a large entity**
(14)  **with multiple investments and it has a**
(15)  **single-purpose LLC -- I can't recall the**
(16)  **name -- that is a member in Dermot Meridian.**
(17)  **I can provide that name if you want it.**
(18)     Q.   So just let me take a step
(19)  back.
(20)          Dermot Property Associates,
(21)  that is another LLC?
(22)     A.   **Yes.**
(23)     Q.   And that has --
(24)     A.   **That is not an LLC.  It is an**
(25)  **LP.  That is a California LP.**

Page 14

(1)
(2)      Q.   And the partners of that entity
(3)   you just don't recall?
(4)      A.   **No.  I just don't know the --**
(5)   **it is a single-purpose LLC that Dermot**
(6)   **Property Associates controls that was the**
(7)   **member in -- that is the member in 475 Ninth**
(8)   **Avenue.  I don't remember the name and I am**
(9)   **not a partner in it.**
(10)         MR. DEVEREAUX:  I think we had
(11)     enough of this background.
(12)     Q.   Meridian Partners, LLC, you
(13)  mentioned that you were the managing partner
(14)  of that entity, correct?
(15)     A.   **Managing member, right.**
(16)     Q.   I'm sorry.  The managing
(17)  member.
(18)     A.   **Yes.  I am that managing member**
(19)  **through another LLC, but I am the personal,**
(20)  **sole owner of that LLC**
(21)     Q.   Meridian Partners, LLC?
(22)     A.   **Meridian Partners, LLC has**
(23)  **several members.  I am the managing member**
(24)  **through an entity that I wholly own, which is**
(25)  **called Meridian Advisors, Meridian Realty**

Page 15

(1)
(2)   Advisors.
(3)      Q.   Who are the other member in
(4)   Meridian Partners, LLC?
(5)      A.   **A number of individuals.**
(6)      Q.   Do you know the names of --
(7)      A.   **I don't recall.  I don't**
(8)   **recall.**
(9)   DI        MR. DEVEREAUX:  I am directing
(10)     him not to answer that.  It is
(11)     irrelevant.
(12)         MR. PREMISLER:  It is not
(13)     irrelevant, Counsel.
(14)         MR. DEVEREAUX:  If you want to
(15)     mark it for a ruling, go ahead.
(16)         MR. PREMISLER:  He already
(17)     answered the question.
(18)     Q.   The property that we are
(19)  talking about at issue in this case is 475
(20)  Ninth Avenue, New York?
(21)     A.   **Yes.**
(22)     Q.   Do you recall when that project
(23)  started and ended?
(24)     A.   **Not the exact dates, but it**
(25)  **started in early 2002 and completed**

Page 16

(1)
(2)   **construction about fifteen months after that**
(3)   **in mid-2003.**
(4)      Q.   And do you know if it was new
(5)   construction, renovation, something else?
(6)      A.   **It was new construction**
(7)   **ground-up construction on a parking lot.**
(8)      Q.   And what kind of building was
(9)   it?
(10)     A.   **Primarily residential building,**
(11)  **underground parking, grade-level retail and**
(12)  **then eleven stories of rental residential.**
(13)     Q.   And 475 Ninth Avenue
(14)  Associates, LLC, that is the owner of that
(15)  building?
(16)     A.   **Was at the time.  It is no**
(17)  **longer.**
(18)     Q.   When did 475 Ninth Avenue
(19)  Associates, LLC, when did their ownership of
(20)  that property cease?
(21)     A.   **It is ceased when the property**
(22)  **was sold to an affiliate of Equity**
(23)  **Residential.  It's a publicly-traded R-E-I-T.**
(24)     Q.   Do you remember generally when
(25)  that was?

SANTOLI                                                              VS. 475 NINTH AVENUE ASSOCIATES
STEPHEN BENJAMIN - 9/28/07

Page 57

(1)
(2) of how that notice is supposed to work?
(3)    A.    That there should be a notice
(4) provided by the subcontractor that an
(5) incident occurred.
(6)    Q.    And who is that notice supposed
(7) to be sent to?
(8)    A.    To the person that they have --
(9) to the entity that they have an agreement
(10) with.
(11)    Q.    Okay.  Is it only that entity
(12) or is it that entity and your company?  That
(13) is my question.
(14)    A.    It's that entity.  We are a
(15) third party to this.
(16)    Q.    Then that entity or the
(17) construction manager, if that is the entity
(18) in question, they are supposed to then
(19) provide, send that along to you?
(20)    A.    That's right.
(21)    MR. PREMISLER:  Would you mark
(22) this as Defendant's Exhibit D.
(23)    (Defendant's Exhibit D,
(24)    supervisor's accident/incident report,
(25)    marked for identification.)

Page 58

(1)
(2)    Q.    I would like to show you a
(3) document that is marked as Defendant's
(4) Exhibit D of today's date.  It is entitled
(5) "Supervisor's Accident/Incident Report 2003."
(6) Take a look at that document and please allow
(7) your attorney to take a look at it.  After
(8) you have had a chance to look at it, let me
(9) know.
(10)    A.    Okay.
(11)    Q.    Do you recognize that document?
(12)    A.    No.
(13)    Q.    Does that refresh your
(14) recollection at all, one way or another,
(15) whether you received an accident report in
(16) connection with Mr. Santoli's accident before
(17) you were served with a lawsuit?
(18)    A.    No.
(19)    Q.    Do you recognize that accident
(20) report or incident report as the form that
(21) was used by the construction manager on this
(22) project?
(23)    A.    No.
(24)    Q.    Have you ever seen an
(25) accident/incident report like that before?

Page 59

(1)
(2)    A.    No, it is not my recollection
(3) that I have.
(4)    Q.    Does that refresh your
(5) recollection at all, one way or another,
(6) whether or not 475 Ninth Avenue Associates
(7) was made aware of the accident prior to
(8) receiving the suit papers in this litigation?
(9)    A.    No, it does not.
(10)    Q.    Thanks.
(11)    MR. DEVEREAUX:  I thought you
(12) said the accident occurred April 7th,
(13) but this says April 3rd.
(14)    MR. PREMISLER:  Off the record.
(15)    (Discussion off the record.)
(16)    MR. PREMISLER:  For the record,
(17) I may have referred to the accident
(18) date before as April 7th.  There may
(19) be or may not be a discrepancy as to
(20) when Mr. Santoli's accident took
(21) place, on April 7th or April 3rd.
(22)    A.    I am sure there is.
(23)    Q.    In any event let's proceed.
(24)    MR. PREMISLER:  If we can mark
(25) this as the next document.

Page 60

(1)
(2)    (Defendant's Exhibit, E,
(3)    summons, marked for identification.)
(4)
(5)    Q.    I would like to show you a
(6) document which is marked as Defendant's
(7) Exhibit E.  The first page is entitled
(8) "Summons."  It is a twenty-two-page document.
(9)    A.    Yes.
(10)    Q.    I want you to just take a look
(11) at it.
(12)    My question is whether or not
(13) those are the legal papers that you referred
(14) to earlier as 475's first notice of the
(15) accident claim or suit at issue here?
(16)    A.    This looks like it to me.
(17)    Q.    Okay.  Do you know how this
(18) document was served or otherwise provided to
(19) 475 Ninth Associates?
(20)    MR. DEVEREAUX:  Objection.  A
(21) copy or a version of it.
(22)    A.    No, I don't.
(23)    MR. DEVEREAUX:  Is that
(24) correct?
(25)    MR. PREMISLER:  Absolutely.

Page 61

(1)
(2)    **Q.    Not that particular document,**
(3)    but a copy of that document?
(4)    **A.    I don't. I don't.**
(5)    **Q.    Is there a practice or**
(6)    procedure set up in your office with respect
(7)    to what should happen when legal papers come
(8)    in, whether it be a subpoena or a summons and
(9)    complaint or something else?
(10)    **A.    At about that time?**
(11)    **Q.    Yes.**
(12)    **A.    At this time, at the time this**
(13)    **occurred, our -- our --**
(14)    **Q.    The date.**
(15)    **A.    Generally our procedure would**
(16)    **be to contact our insurance carrier and**
(17)    **notify them that we have received this, as**
(18)    **well as our legal counsel, and they would**
(19)    **follow through with whatever steps were the**
(20)    **next appropriate steps.**
(21)    **MR. DEVEREAUX:  There are two**
(22)    dates on the front. One is October
(23)    20th and the other October 27th.
(24)    **Q.    So generally, the practice or**
(25)    procedure in October of 2003, was it about

Page 62

(1)
(2)    the same?
(3)    **A.    Yes. It would be within a**
(4)    **reasonable time period, within a week or so,**
(5)    **and that is to provide this same paper that**
(6)    **we received to our lawyer and to our**
(7)    **insurance company; in this case the carrier**
(8)    **for the contractor who provided us with the**
(9)    **coverage, Kajima Construction, Kajima/VJB**
(10)    **Construction, LLC.**
(11)    **Q.    But not to Travelers?**
(12)    **A.    Correct.**
(13)    **Q.    I will take a step back.**
(14)    Generally speaking, when mail came into your
(15)    office at or about October of 2003, was it
(16)    stamped received or marked in some other way
(17)    as to when it was actually received?
(18)    **A.    Probably not at that time. We**
(19)    **were a young company and we probably would**
(20)    **have just stacked it. It just was us, just**
(21)    **me and Drew. We would have passed this on to**
(22)    **our lawyer, you know, and started to take**
(23)    **action.**
(24)    **Q.    Okay. How would you pass it on**
(25)    to your lawyer? Would you have written a

Page 63

(1)
(2)    letter, an e-mail, something else at that
(3)    time?
(4)    **A.    Yes.**
(5)    **Q.    A letter?**
(6)    **A.    Or e-mail, yeah, or a phone**
(7)    **call. Then we would fax it over.**
(8)    **Q.    I guess my question is whether**
(9)    or not there is any documentation in your
(10)    file anywhere that would indicate when 475
(11)    Ninth Avenue Associates received that
(12)    document, Exhibit E, or a copy of that
(13)    document?
(14)    **A.    I don't know the answer to**
(15)    **that. It is possible.**
(16)    **Q.    What is 1775 Broadway, New**
(17)    York, New York?
(18)    **A.    That is our former office.**
(19)    **1775 Broadway was our office at that time**
(20)    **that we were doing this project in general in**
(21)    **2003. We subsequently moved to 320 West 57th**
(22)    **Street, New York. We maintain an office at**
(23)    **1775 Broadway as well.**
(24)    **Q.    Currently?**
(25)    **A.    But it is not in the same**

Page 64

(1)
(2)    space.
(3)    **Q.    Suite 730?**
(4)    **A.    Yeah. We moved to another**
(5)    **suite. I don't remember the number, but our**
(6)    **management company, our property management**
(7)    **company, Dermot Company Realty Management**
(8)    **Company, is officed over at 1775 Broadway.**
(9)    **Q.    I am asking back in October of**
(10)    2003?
(11)    **A.    Our office was at 1775**
(12)    **Broadway.**
(13)    **Q.    When you say your office, 475**
(14)    Ninth Avenue Associates?
(15)    **A.    Yes.**
(16)    **Q.    And it would have been suite**
(17)    730 in that building?
(18)    **A.    Yes. I would have to just**
(19)    **confirm what our lease was, but my**
(20)    **recollection is that it was suite 730, that**
(21)    **was not served somewhere else or something,**
(22)    **that we received it about those dates.**
(23)    **Q.    Okay. As you sit here today,**
(24)    do you remember when 475 Ninth Avenue
(25)    Associates first received these legal papers?

Page 65

(1)
(2)    A.   In 2003.
(3)    Q.   I guess my question is a
(4) little bit broader than that.
(5)         Do you remember, generally
(6) speaking, whether or not you personally saw
(7) them when they first came in or somebody
(8) else?
(9)    A.   I was served the papers.
(10)   Q.   Oh, you personally?
(11)   A.   I would have to have been,
(12) because I am the partner. I am the person
(13) who is named within the agreements and my
(14) personal name is as an additional insured.
(15) So I am certain they served me. Again, it is
(16) possible they sent it for convenience to Drew
(17) Spitler, but it was intended for 475 Ninth
(18) Avenue Associates, and I am the known
(19) representative of 475 Ninth Avenue
(20) Associates.
(21)   Q.   I misunderstood you. So you
(22) would have received these papers sometime in
(23) 2003?
(24)   A.   Yes.
(25)   Q.   When you say "you," I am

Page 66

(1)
(2) talking about you personally, not --
(3)    A.   Yeah.
(4)    Q.   Okay. Do you remember
(5) specifically what you did when you saw these
(6) legal papers?
(7)    A.   No, I don't. I don't remember
(8) specifically that I was served the papers.
(9) You know, they may have been served to our
(10) office. Our secretary could have signed.
(11) Drew could have signed. I don't remember
(12) exactly what happened. As I said, we would
(13) have reviewed it and passed it on to our
(14) lawyers Zetlin & Dechiara, to Michael Zetlin.
(15)   Q.   Okay. Let me just clarify
(16) something. I may have used the word "served"
(17) before.
(18)   A.   Yes.
(19)   Q.   I was not using it in a legal
(20) context. When I said "served," I mean when
(21) you were served or received in any way these
(22) legal papers.
(23)   A.   Yes.
(24)   Q.   Not officially handed the
(25) papers from a process server, but whether or

Page 67

(1)
(2) not you received, you know, someone gave them
(3) to you otherwise.
(4)    A.   Yes.
(5)    Q.   So just to clarify, I just want
(6) to make sure we are both on the same page,
(7) all of us.
(8)         Exhibit E, you personally
(9) received these in 2003?
(10)   A.   No. That is not what I said.
(11)   Q.   Okay. Then I misunderstood
(12) then.
(13)   A.   I said that I'm not sure. I do
(14) not recall whether I received those papers
(15) personally and acted on them or whether our
(16) company did.
(17)   Q.   Okay.
(18)   A.   Meaning the other few people
(19) that work at 1775 Broadway on behalf of The
(20) Dermot Company and 475 Ninth Avenue at that
(21) time, but I am pretty sure it was me.
(22)   Q.   It was either you or somebody
(23) else at your company who received the papers
(24) in 2003?
(25)   A.   Yes, and there were not that

Page 68

(1)
(2) many people, as we have discussed.
(3)    Q.   And Zetlin -- Zetlin --
(4)    A.   Zetlin & Dechiara is the firm,
(5) legal firm who has represented us on behalf
(6) of 475 Ninth Avenue in the negotiation of
(7) this agreement, the construction I mean
(8) Kajima/VJB Construction and all of our
(9) construction-related activities. They were
(10) done on this project and on others.
(11)   Q.   Were they retained by 475 Ninth
(12) after receiving these litigation papers,
(13) these legal papers?
(14)   A.   They were retained on an
(15) ongoing basis, not as a result of this. We
(16) had retained them for several years prior to
(17) that.
(18)   Q.   I just want to clarify. Zetlin
(19) & Dechiara were not retained by an insurance
(20) company, correct?
(21)   A.   Not on this project.
(22)   Q.   I am referring to this
(23) particular lawsuit.
(24)   A.   Yeah, absolutely not.
(25)   Q.   Okay. This was your company



Page 69

(1)
(2) personally that paid them in some way, shape
(3) or form to represent you in connection with
(4) this litigation?
(5)     **MR. DEVEREAUX:** Well, I think
(6) he just said the opposite. I think he
(7) said he has an ongoing relationship
(8) with them and it wasn't specific
(9) retention for this project or this
(10) lawsuit.
(11)     **THE WITNESS:** Right.
(12)     **A.** **They assisted us in reviewing**
(13) **this matter and providing assistance with us**
(14) **in referring it to our insurance company and**
(15) **to our contractor, Kajima/VJB, our**
(16) **construction manager, Kajima/VJB**
(17) **Construction, so that we followed procedures**
(18) **that were required within the construction**
(19) **management agreement.**
(20)     **MR. DEVEREAUX:** There was no
(21) specific retention in this aspect. It
(22) was ongoing.
(23)     **Q.** My question was really, were
(24) they your lawyers in connection with this
(25) lawsuit?

Page 70

(1)
(2)     **A.** **No.**
(3)     **Q.** When you say "our insurance
(4) company," what insurance company are you
(5) referring to?
(6)     **A.** **Good question. The insurance**
(7) **company that was providing the insurance to**
(8) **us as additional insured through Kajima/VJB**
(9) **Construction Services.**
(10)     **Q.** You are not referring to
(11) Travelers, correct?
(12)     **A.** **No.**
(13)     **Q.** Okay. Do you remember who that
(14) insurance company was?
(15)     **A.** **My recollection is that it was**
(16) **Liberty.**
(17)     **Q.** Liberty Mutual Insurance
(18) Company?
(19)     **A.** **I don't recall.**
(20)     **MR. PREMISLER:** Could you mark
(21) that.
(22)     **(Defendant's Exhibit F, verified**
(23) **answer, marked for identification.)**
(24)     **MR. PREMISLER:** For the record,
(25) that is Defendant's Exhibit F. It is

Page 71

(1)
(2) the verified answer of 475 Ninth
(3) Avenue Associates, LLC dated June 21,
(4) 2005.
(5)     **Q.** I just want you to take a look
(6) at that. That is the law firm there --
(7)     **A.** **Yes.**
(8)     **Q.** -- that appeared on your behalf
(9) that you were just referring to?
(10)     **A.** **Yes. The lawyer's name is Tim**
(11) **Hagerty.**
(12)     **Q.** Just flip to the second to the
(13) last page where it has the verification.
(14)     There is a signature above the
(15) name Stephen N. Benjamin, right?
(16)     **A.** **Yes.**
(17)     **Q.** Do you recognize that
(18) signature?
(19)     **A.** **Sure do.**
(20)     **Q.** And whose signature is that?
(21)     **A.** **Mine.**
(22)     **MR. DEVEREAUX:** For the record,
(23) it is June 21, 2004, not 2005.
(24)     **MR. PREMISLER:** Okay.
(25)     **Q.** Do you know when you signed the

Page 72

(1)
(2) document there?
(3)     **A.** **June 21, 2004, and the notary**
(4) **was signed on June 22nd.**
(5)     **Q.** That is when you signed it?
(6)     **A.** **Yes. I thought that was your**
(7) **question.**
(8)     **Q.** Yes. Do you remember having
(9) any conversations or communications with
(10) anybody other than your attorney about this
(11) lawsuit between the time when 475 Ninth
(12) Avenue Associates received the litigation
(13) papers and the time when this verified answer
(14) was signed?
(15)     **MR. DEVEREAUX:** Just read back
(16) the question.
(17)     **(Record read.)**
(18)     **MR. DEVEREAUX:** Just objection.
(19) Vague, but go ahead.
(20)     **MR. PREMISLER:** Just to
(21) clarify, the litigation papers that
(22) you are referring to is Defendant's
(23) Exhibit E.
(24)     **A.** **I don't have a definite**
(25) **recollection, but I would expect there was**



Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GEORGE SANTOLI and STACEY SANTOLI,

                          Index No.:

                Plaintiff(s),

                                  03118596

  - against -

                              *SUMMONS*

475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION
475 9TH AVENUE LLC, VJB CONSTUCTION CORP.,
SPIELER & RICCA ELECTRICAL CO. INC., and
KAJIMA DEVELOPMENT CORPORATION,

                      **FILED**

                               Basis of Venue:
             Defendant(s) OCT 27 2003  Defendant's
                               Residence

                       NEW YORK
                 COUNTY CLERK'S OFFICE
To the above named Defendant(s):

     YOU ARE HEREBY SUMMONED to answer the complaint in this action
and to serve a copy of your answer, or, if the complaint is not served
with this summons, to serve a notice of appearance, on the plaintiff's
attorney within 20 days after the service of this summons, exclusive
of the day of service (or within 30 days after the service is complete
if this summons is not personally delivered to you within the State of
New York); and in case of your failure to appear or answer, judgment
will be taken against you by default for the relief demanded in the
complaint.

Defendants' address is:
-475 Ninth Avenue Associates LLC, c/o Dermot Meridian, LLC, 1775
Broadway, Suite 730, New York, NY 10022
-VJB Construction 475 9th Avenue LLC, Altieri, Kushner, Muccio & Frind,
Attn: Dennis Frind, 60 East 42nd Street, New York, NY 10165
-VJB Construction Corp., c/o C T Corporation System, 111 Eighth
Avenue, New York, NY 10011
-Spieler & Ricca Electrical Co. Inc., Ronald Spieler 52-09 Van Dam
Street, Long Island City, New York 11101
-KAJIMA DEVELOPMENT CORPORATION-Latham & Watkins, Attn: Jamie
Hisiger, 885 Third Avenue, New York, NY 10022

Dated:    New York, New York
         October 20, 2003

                        1



Yours, etc.

Hach & Rose, LLP
185 Madison Avenue, 8th Floor
New York, NY   10016

By: _____
        Michael A. Rose

To:
475 Ninth Avenue Associates LLC
c/o Dermot Meridian, LLC
1775 Broadway. Suite 730
New York, NY  10022

VJB Construction 475 9th Avenue LLC
Altieri, Kushner, Muccio & Frind
Attn:  Dennis Frind
60 East 42nd Street
New York, NY  10165

VJB Construction Corp.
c/o C T Corporation System
111 Eighth Avenue
New York, NY  10011

Spieler & Ricca Electrical Co. Inc.
Ronald Spieler
52-09 Van Dam Street
Long Island City, New York  11101

Kajima Development Corporation
Latham & Watkins
Attn: Jamie Risiger
885 Third Avenue
New York, NY  10022

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------x
GEORGE SANTOLI and STACEY SANTOLI,

              Index No.

            Plaintiff(s),

      -against-             *VERIFIED COMPLAINT*

475 NINTH AVENUE ASSOCIATES LLC, VJB
CONSTRUCTION 475 9TH AVENUE LLC, VJB
CONSTUCTION CORP., SPIELER & RICCA
ELECTRICAL CO. INC., and
KAJIMA DEVELOPMENT CORPORATION,      03118596

            Defendant(s).
------------------------------------------x

        Plaintiffs, GEORGE SANTOLI and STACEY SANTOLI, by his attorneys, Hach & Rose, L.L.P., complaining of the defendants herein, respectfully shows to this Court, and allege as follows:

    1.    That at all times hereinafter mentioned the plaintiff(s) were residents of the town of Marlboro, State of New Jersey.

    2.    That at all times mentioned herein, and on April 7, 2003, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, is was and has been a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

    3.    That at all times mentioned herein the defendant, 475 NINTH AVENUE ASSOCIATES LLC, is, was and has been a domestic partnership and/or other domestic business entity doing business in the State of New York.

    4.    That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, transacted business within the State of New York; regularly did or solicited business within the State of New York or engaged in other persistent courses conduct and/or derived substantial

revenue from goods used or consumed or services rendered in the State of New York and expected or should have reasonably expected its acts to have consequences within the State of New York and/or derived substantial revenue from interstate or international commerce.

5. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

6. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the agent of the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

7. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the lessee of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

8. That at all times mentioned herein, the defendant, all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the lessor of the land and structures thereon commonly known as 475 Ninth Avenue, New York, NY.

9. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, operated the premises commonly known as 475 Ninth Avenue, New York, NY.

10. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, controlled the premises commonly known as 475 Ninth Avenue, New York, NY.

11. That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, maintained the premises commonly known as 475 Ninth Avenue, New York, NY.

4

12.    That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, possessed and/or occupied the premises commonly known as 475 Ninth Avenue, New York, NY.

13.    That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the managing agent of the premises commonly known as 475 Ninth Avenue, New York, NY.

14.    That at all times mentioned herein, the defendant, 475 NINTH AVENUE ASSOCIATES LLC, was the general contractor of the premises commonly known as 475 Ninth Avenue, New York, NY.

15.    That on or prior to April 7, 2003, 475 NINTH AVENUE ASSOCIATES LLC, retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

16.    That on or prior to April 7, 2003, a party that 475 NINTH AVENUE ASSOCIATES LLC, had leased the aforementioned premises to had retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

17.    That at all times mentioned herein, and on April 7, 2003, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, is was and has been a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

18.    That at all times mentioned herein the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, is, was and has been a domestic partnership and/or other domestic business entity doing business in the State of New York.

5

19. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, transacted business within the State of New York; regularly did or solicited business within the State of New York or engaged in other persistent courses conduct and/or derived substantial revenue from goods used or consumed or services rendered in the State of New York and expected or should have reasonably expected its acts to have consequences within the State of New York and/or derived substantial revenue from interstate or international commerce.

20. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

21. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the agent of the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

22. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the lessee of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

23. That at all times mentioned herein, the defendant, all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the lessor of the land and structures thereon commonly known as 475 Ninth Avenue, New York, NY.

24. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, operated the premises commonly known as 475 Ninth Avenue, New York, NY.

25. That at all times mentioned herein, the defendant, VJB

6

CONSTRUCTION 475 9TH AVENUE LLC, controlled the premises commonly known as 475 Ninth Avenue, New York, NY.

26. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, maintained the premises commonly known as 475 Ninth Avenue, New York, NY.

27. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, possessed and/or occupied the premises commonly known as 475 Ninth Avenue, New York, NY.

28. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the managing agent of the premises commonly known as 475 Ninth Avenue, New York, NY.

29. That at all times mentioned herein, the defendant, VJB CONSTRUCTION 475 9TH AVENUE LLC, was the general contractor of the premises commonly known as 475 Ninth Avenue, New York, NY.

30. That on or prior to April 7, 2003, VJB CONSTRUCTION 475 9TH AVENUE LLC, retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

31. That on or prior to April 7, 2003, a party that VJB CONSTRUCTION 475 9TH AVENUE LLC, had leased the aforementioned premises to had retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

32. That at all times mentioned herein the defendant, VJB CONSTRUCTION CORP., is, was and has been a domestic partnership and/or other domestic business entity doing business in the State of New York.

7

33. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., transacted business within the State of New York; regularly did or solicited business within the State of New York or engaged in other persistent courses conduct and/or derived substantial revenue from goods used or consumed or services rendered in the State of New York and expected or should have reasonably expected its acts to have consequences within the State of New York and/or derived substantial revenue from interstate or international commerce.

34. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

35. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the agent of the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

36. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the lessee of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

37. That at all times mentioned herein, the defendant, all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the lessor of the land and structures thereon commonly known as 475 Ninth Avenue, New York, NY.

38. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., operated the premises commonly known as 475 Ninth Avenue, New York, NY.

39. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., controlled the premises commonly known as 475 Ninth

8

Avenue, New York, NY.

40. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., maintained the premises commonly known as 475 Ninth Avenue, New York, NY.

41. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., possessed and/or occupied the premises commonly known as 475 Ninth Avenue, New York, NY.

42. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the managing agent of the premises commonly known as 475 Ninth Avenue, New York, NY.

43. That at all times mentioned herein, the defendant, VJB CONSTRUCTION CORP., was the general contractor of the premises commonly known as 475 Ninth Avenue, New York, NY.

44. That on or prior to April 7, 2003, VJB CONSTRUCTION CORP., retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

45. That on or prior to April 7, 2003, a party that VJB CONSTRUCTION CORP., had leased the aforementioned premises to had retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

46. That at all times mentioned herein the defendant, SPIELER & RICCA ELECTRICAL CO. INC., is, was and has been a domestic partnership and/or other domestic business entity doing business in the State of New York.

47.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., transacted business within the State of New York; regularly did or solicited business within the State of New York or engaged in other persistent courses conduct and/or derived substantial revenue from goods used or consumed or services rendered in the State of New York and expected or should have reasonably expected its acts to have consequences within the State of New York and/or derived substantial revenue from interstate or international commerce.

48.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

49.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the agent of the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

50.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the lessee of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

51.    That at all times mentioned herein, the defendant, all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the lessor of the land and structures thereon commonly known as 475 Ninth Avenue, New York, NY.

52.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., operated the premises commonly known as 475 Ninth Avenue, New York, NY.

53.    That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., controlled the premises commonly known as 475

10

Ninth Avenue, New York, NY.

54. That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., maintained the premises commonly known as 475 Ninth Avenue, New York, NY.

55. That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., possessed and/or occupied the premises commonly known as 475 Ninth Avenue, New York, NY.

56. That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the managing agent of the premises commonly known as 475 Ninth Avenue, New York, NY.

57. That at all times mentioned herein, the defendant, SPIELER & RICCA ELECTRICAL CO. INC., was the general contractor of the premises commonly known as 475 Ninth Avenue, New York, NY.

58. That on or prior to April 7, 2003, SPIELER & RICCA ELECTRICAL CO. INC., retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

59. That on or prior to April 7, 2003, a party that SPIELER & RICCA ELECTRICAL CO. INC., had leased the aforementioned premises to had retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

60. That at all times mentioned herein, and on April 7, 2003, the defendant, KAJIMA DEVELOPMENT CORPORATION, is was and has been a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

11

61. That at all times mentioned herein the defendant, KAJIMA DEVELOPMENT CORPORATION, is, was and has been a domestic partnership and/or other domestic business entity doing business in the State of New York.

62. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, transacted business within the State of New York; regularly did or solicited business within the State of New York or engaged in other persistent courses conduct and/or derived substantial revenue from goods used or consumed or services rendered in the State of New York and expected or should have reasonably expected its acts to have consequences within the State of New York and/or derived substantial revenue from interstate or international commerce.

63. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

64. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the agent of the owner of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

65. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the lessee of the land and structures thereon, commonly known as 475 Ninth Avenue, New York, NY.

66. That at all times mentioned herein, the defendant, all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the lessor of the land and structures thereon commonly known as 475 Ninth Avenue, New York, NY.

67. That at all times mentioned herein, the defendant, KAJIMA

12

DEVELOPMENT CORPORATION, operated the premises commonly known as 475 Ninth Avenue, New York, NY.

68. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, controlled the premises commonly known as 475 Ninth Avenue, New York, NY.

69. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, maintained the premises commonly known as 475 Ninth Avenue, New York, NY.

70. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, possessed and/or occupied the premises commonly known as 475 Ninth Avenue, New York, NY.

71. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the managing agent of the premises commonly known as 475 Ninth Avenue, New York, NY.

72. That at all times mentioned herein, the defendant, KAJIMA DEVELOPMENT CORPORATION, was the general contractor of the premises commonly known as 475 Ninth Avenue, New York, NY.

73. That on or prior to April 7, 2003, KAJIMA DEVELOPMENT CORPORATION, retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

74. That on or prior to April 7, 2003, a party that KAJIMA DEVELOPMENT CORPORATION, had leased the aforementioned premises to had retained plaintiff's employer, to perform certain work, labor and/or services at the premises commonly known as 475 Ninth Avenue, New York, NY.

13

75. That at all times mentioned herein the plaintiff, GEORGE SANTOLI, was employed and was performing his work at the construction site as aforesaid, at 475 Ninth Avenue, New York, NY.

76. That on or about, April 7, 2003 while acting within the scope of his employment at the construction site as aforesaid, the plaintiff was caused to fall and sustain the injuries as set forth more fully below.

77. That the above occurrence was caused solely by and through the negligence of the defendants herein, without any negligence on the part of the plaintiff contributing thereto.

78. That the defendants, and/or each of them had both actual and constructive notice of the dangerous and defective conditions and practices complained of herein.

79. Plaintiff asserts an exemption from the abolition of joint and several liability pursuant to Article 16 of the C.P.L.R.

80. That the defendants, and/or each of them, and/or their agents, servants, associates and/or employees were negligent, careless and reckless, in that they:

a) Negligently, carelessly and recklessly, failed and omitted to properly construct, shore, equip, guard, arrange, operate and conduct the construction activities at the construction site as aforesaid, so as to provide reasonable and adequate protection and safety to the persons so employed therein, and more particularly to the plaintiff herein;

b) Failed and omitted to provide the plaintiff with a safe place to work and negligently maintained and separated a ladder at the

14

subject location;

c)    Failed and omitted to provide the plaintiff and the workers at the construction site thereat, with adequate, ample and proper scaffolding and ladders so as to perform their labor;

d)    Failed and omitted to insure that the working areas within the premises of the construction site as aforesaid were kept free of hazardous conditions and debris;

e)    Failed and omitted to provide the plaintiff with a safety belt;

f)    Failed and omitted to provide the plaintiff with a hardhat;

g)    Failed and omitted to properly inspect the construction site as aforesaid;

h)    Failed and omitted to properly and adequately coordinate the construction activities at the construction site as aforesaid so as to prevent the various trades from interfering with one another;

i)    Failed and omitted to construct and/or install barricades and/or other warnings so as to apprise workers, and more particularly the plaintiff herein, of the dangerous conditions existing thereat;

j)    Failed and omitted to comply with Section 240 of the Labor Law of the State of New York;

k)    Failed and omitted to comply with Section 241 of the Labor Law of the State of New York;

l)    Failed and omitted to comply with Section 241-a of the Labor Law of the State of New York;

m)    Failed and omitted to comply with Section 200 of the

15

Labor Law of the State of New York;

n) Failed and omitted to comply with Rule 23 of the Industrial Code;

o) Failed and omitted to properly secure the work area so that plaintiff could perform his labor in a safe environment;

p) Failed and omitted to keep the work areas free of debris and other material;

q) Failed and omitted to provide the Plaintiff with the proper and necessary equipment to perform his job;

r) Failed and omitted to provide the Plaintiff with adequate hoists or other lifting equipment.

81. That as a result of the negligence of the defendants, and/or each of them, the plaintiff, GEORGE SANTOLI, became, still is and for a long time to come, will be sick, sore, lame, bruised, injured, disabled and wounded in and about the various parts of her head, limbs, body, blood vessels and surrounding tissues, and has suffered severe and extreme mental shock, anguish and psychic injuries, and that plaintiff was otherwise injured, and upon information and belief, said injuries are permanent. That by reason of the foregoing, the plaintiff was obligated to and did necessarily employ medical aid, hospital services, medicinals and medical supplies in an attempt to cure the aforesaid injuries, and has been prevented from his/her usual duties and will be so prevented for a long time to come.

82. That by reason of the foregoing, the plaintiff, GEORGE SANTOLI, has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A SECOND CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF, GEORGE SANTOLI
### BASED UPON A THEORY OF STATUTORY LIABILITY:

83. That the plaintiff, GEORGE SANTOLI, repeats, reiterates and realleges each and every allegation of the complaint in paragraphs numbered "1" through "82", with the same force and effect as though each and every allegation were set forth more fully herein at length below.

84. That at all times mentioned herein, and on April 7, 2003, Section 200 of the Labor law of the State of New York was in full force and effect.

85. That at all times mentioned herein, and on April 7, 2003, the defendants, and/or each of them were subject to the provisions of the statute as cited herein above.

86. That on or about, April 7, 2003, the defendants, and/or each of them were in violation of the Statute as cited as herein above.

87. That as a result of the statutory violation as cited herein above, the plaintiff, GEORGE SANTOLI, was caused to sustain the injuries as set forth herein above.

88. That as a result of the foregoing the plaintiff, GEORGE SANTOLI, has been damaged in the sum of TWO MILLION ($2,000,000.00) DOLLARS.

### AS AND FOR A THIRD CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF, GEORGE SANTOLI
### BASED UPON A THEORY OF STATUTORY LIABILITY:

89. That the plaintiff, repeats, reiterates and realleges each and every allegation of the complaint in paragraphs numbered "1" through "88", with the same force and effect as though each and every allegation

17

were set forth more fully herein at length below.

90. That at all times mentioned herein, and on April 7, 2003, Section 241 of the Labor law of the State of New York was in full force and effect.

91. That at all times mentioned herein, and on April 7, 2003, the defendants, and/or each of them were subject to the provisions of the statute as cited herein above.

92. That on or about, April 7, 2003, the defendants, and/or each of them were in violation of the statute as cited as herein above.

93. That as a result of the statutory violation as cited herein above, the plaintiff, GEORGE SANTOLI, was caused to sustain the injuries as set forth herein above.

94. That as a result of the foregoing the plaintiff, GEORGE SANTOLI, has been damaged in the sum of TWO MILLION ($2,000,000.00) DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF, GEORGE SANTOLI BASED UPON A THEORY OF STATUTORY LIABILITY;

95. That the plaintiff, GEORGE SANTOLI, repeats, reiterates and realleges each and every allegation of the complaint in paragraphs numbered "1" through "94", with the same force and effect as though each and every allegation were set forth more fully herein at length below.

96. That at all times mentioned herein, and on April 7, 2003, Section 240 of the Labor law of the State of New York was in full force and effect.

97. That at all times mentioned herein, and on April 7, 2003, the

18

defendants, and/or each of them were subject to the provisions of the statute as cited herein above.

98. That on or about, April 7, 2003, the defendants, and/or each of them were in violation of the Statute as cited as herein above.

99. That as a result of the statutory violation as cited herein above, the plaintiff, GEORGE SANTOLI, was caused to sustain the injuries as set forth herein above.

100. That as a result of the foregoing the plaintiff, GEORGE SANTOLI, has been damaged in the sum of TWO MILLION ($2,000,000.00) DOLLARS.

## AS AND FOR A FIFTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF, STACEY SANTOLI

101. That the Plaintiff, STACEY SANTOLI repeats, reiterates and realleges each and every allegation of the complaint in paragraphs numbered "1" through "100", with the same force and effect as though each and every allegation were set forth more fully herein at length below;

102. That at all times hereinafter mentioned, Plaintiff, STACEY SANTOLI was the lawful spouse of the Plaintiff, GEORGE SANTOLI and as such said Plaintiff, STACEY SANTOLI was entitled to the society, services and consortium of the said Plaintiff;

103. By reason of the afore-described negligence of the Defendants, their agents, servants and/or employees, the Plaintiff, STACEY SANTOLI was deprived of the aforesaid society, services and consortium of the Plaintiff, GEORGE SANTOLI and shall forever be deprived of said society, services and consortium;

19

104. That by reason of the foregoing negligence on the part of the Defendants, the Plaintiff STACEY SANTOLI has been damaged in a sum exceeding FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS, together with the costs and disbursements of this action.

WHEREFORE, the plaintiff, GEORGE SANTOLI, demands judgment against the defendant(s), 475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION 475 9TH AVENUE LLC, VJB CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL CO. INC., and KAJIMA DEVELOPMENT CORPORATION in the amount of FIVE MILLION ($5,000,000.00) DOLLARS, on the First Cause of Action;

WHEREFORE, the plaintiff, GEORGE SANTOLI, demands judgment against the defendant(s), 475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION 475 9TH AVENUE LLC, VJB CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL CO. INC., and KAJIMA DEVELOPMENT CORPORATION in the amount of TWO MILLION ($2,000,000.00) DOLLARS, on the Second Cause of Action;

WHEREFORE, the plaintiff, GEORGE SANTOLI, demands judgment against the defendant(s), 475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION 475 9TH AVENUE LLC, VJB CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL CO. INC., and KAJIMA DEVELOPMENT CORPORATION in the amount of TWO MILLION ($2,000,000.00) DOLLARS, and/or each of them in the amount of TWO MILLION ($2,000,000.00) DOLLARS, on the Third Cause of Action;

WHEREFORE, the plaintiff GEORGE SANTOLI, demands judgment against the defendant(s), 475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION 475 9TH AVENUE LLC, VJB CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL CO. INC., and KAJIMA DEVELOPMENT CORPORATION in the amount of TWO MILLION ($2,000,000.00) DOLLARS, on the Fourth Cause of Action.

WHEREFORE, the plaintiff STACEY SANTOLI, demands judgment against the defendant(s), 475 NINTH AVENUE ASSOCIATES LLC, VJB CONSTRUCTION 475 9TH AVENUE LLC, VJB CONSTRUCTION CORP., SPIELER & RICCA ELECTRICAL CO. INC., and KAJIMA DEVELOPMENT CORPORATION in the amount of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS, on the Fifth Cause of Action.


Dated:    New York, New York
          October 20, 2003

                              Yours, etc.,


                              _____
                              Michael A. Rose
                              Hach & Rose, LLP
                              185 Madison Avenue, 8th Floor
                              New York, NY  10016
                              (212)779-0057

21

STATE OF NEW YORK    }
                     }  ss.
COUNTY OF NEW YORK   }

Michael A. Rose, being duly sworn, deposes and says:

That deponent is a member with HACH & ROSE, L.L.P., attorneys for the plaintiff in the within action; that the deponent has read the foregoing SUMMONS AND COMPLAINT and knows the contents thereof; that the same is true to deponents knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true and the reasons that this verification is not made by the plaintiff and is made by deponent is that plaintiff does not reside in the county where the attorney for the plaintiff have their office.

Deponent further says that the source of deponent's information and the grounds of deponent's beliefs as to all matters not stated upon deponent's knowledge are from investigation made on behalf of said plaintiff.

DATED:    NEW YORK, NEW YORK
          October 20, 2003

Michael A. Rose

Exhibit E

Page 1

```
1
2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
3   -------------------------------------------X
    GEORGE SANTOLI and STACEY SANTOLI,
4
            PLAINTIFFS,
5
        -against-
6
    475 NINTH AVENUE ASSOCIATES, LLC., VJB
7   CONSTRUCTION, 475 9TH AVENUE LLC, VJB
    CONSTRUCTION CORP., SPIELER & RICCA
8   ELECTRICAL CO., INC. and KAJIMA DEVELOPMENT
    CORPORATION,
9
            DEFENDANTS.
10  -------------------------------------------X
    VJB CONSTRUCTION CORP., LIBERTY INTERNATIONAL
11  UNDERWRITERS a/s/o VJB CONSTRUCTION CORP.,
12      THIRD-PARTY PLAINTIFFS,
13      -against-
14  R&J CONSTRUCTION CORP.; TRAVELERS INDEMNITY
    COMPANY; TRAVELERS INDEMNITY COMPANY OF
15  AMERICA; TRAVELERS INDEMNITY COMPANY OF
    CONNECTICUT; REPUBLIC FRANKLIN INSURANCE
16  COMPANY; UTICA NATIONAL INSURANCE COMPANY OF
    TEXAS; UTICA NATIONAL INSURANCE GROUP;
17  UTICA MUTUAL INSURANCE COMPANY; REGIONAL
    SCAFFOLDING and HOISTING CO., INC.,
18
            THIRD-PARTY DEFENDANTS.
19  -------------------------------------------X
20  (caption continued)
21
22
23
24
25
```

Page 2

```
1
2
3
4           DATE: April 5, 2005
5           TIME: 10:00 a.m.
6
7       EXAMINATION BEFORE TRIAL of the
8   Defendant/Third-Party Plaintiffs, VJB CONSTRUCTION
9   CORP., by a witness, EDWARD VENEZIA, taken by
10  adverse parties, pursuant to a subpoena, held at
11  the offices of Devereaux & Associates, LLP, 39
12  Broadway, New York, New York 10006, before a Notary
13  Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4       HACH & ROSE, LLP
            Attorneys for the Plaintiffs
5           185 Madison Avenue
            New York, New York 10016
6       BY: MICHAEL ROSE, ESQ.
7
8
        DEVEREAUX & ASSOCIATES, LLP
9           Attorneys for the Defendant/Third-Party
            Plaintiffs
10          39 Broadway
            New York, New York 10006
11      BY: JENNIFER HUANG, ESQ.
12
13      O'CONNOR, O'CONNOR, HINTZ & DEVENEY, LLP
            Attorneys for the Defendant
14          SPIELER & RICCA ELECTRICAL CO., INC
            One Huntington Quadrangle
15          Melville, New York 11747
        BY: PHILIP CASTELLANO, ESQ.
16
17
18      FUREY, KERLEY, WALSH, MATERA & CINQUEMANI, P.C.
            Attorneys for the Third-Party Defendants
19          UTICA NATIONAL INSURANCE GROUP
            2174 Jackson Avenue
20          Seaford, New York 11783
        BY: STEPHEN E. RACH II, ESQ.
21
22
        RUTHERFORD & CHRISTIE, LLP
23          Attorneys for the Third-Party Defendant
            R&J CONSTRUCTION CORP.
24          300 E.42nd Street
            New York, New York 10017
25      BY: TANIA M. TORNO, ESQ.
```

Page 4

```
1
2       FRANK H. WRIGHT, ESQ.
            Attorney for the Third-Party Defendant
3           REGIONAL SCAFFOLDING & HOISTING
            641 Lexington Avenue
4           New York, New York 11747
        BY: ROBERT SANCHEZ, ESQ.
5
6       LAZARE, POTTER, GIANCOVAJ & KRANJAC, LLP
            Attorneys for the Third-Party Defendant
7           TRAVELERS INSURANCE COMPANY
            950 Third Avenue
8           New York, New York 10022
        BY: ANDREW PREISLER, ESQ.
9
            *       *       *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2        STIPULATIONS
 3
 4      IT IS HEREBY STIPULATED AND AGREED by and
 5   between the attorneys for the respective parties
 6   herein that the sealing, filing and certification
 7   of the within examination before trial be waived;
 8   that all objections except as to form are reserved
 9   to the time of trial.
10      IT IS FURTHER STIPULATED AND AGREED that the
11   transcript may be signed before any Notary Public
12   with the same force and effect as if signed before
13   a clerk or a Judge of the court.
14      IT IS FURTHER STIPULATED AND AGREED that the
15   examination before trial may be utilized for all
16   purposes as provided by the CPLR.
17      IT IS FURTHER STIPULATED AND AGREED that all
18   rights provided to all parties by the CPLR cannot
19   be deemed waived and the appropriate sections of
20   the CPLR shall be controlling with respect hereto.
21      IT IS FURTHER STIPULATED AND AGREED by and
22   between the attorneys for the respective parties
23   hereto that a copy of this examination shall be
24   furnished, without charge, to the attorneys
25   representing the witness testifying herein.
```

Page 6

```
 1                E. VENEZIA
 2   E D W A R D   V E N E Z I A, called as a witness,
 3   having been first duly sworn by a Notary Public of
 4   the State of New York, was examined and testified
 5   as follows:
 6   EXAMINATION BY
 7   MR. ROSE:
 8      Q.   Please state your name for the record.
 9      A.   Edward Venezia.
10      Q.   Where do you reside?
11      A.   30 Waterside Plaza, Apartment 31K, New
12   York, New York 10010.
13      Q.   Good morning, Mr. Venezia.
14      A.   Good morning.
15      Q.   My name is Michael Rose.  I represent a
16   man named George Santoli regarding an incident that
17   occurred on
18   April 2, 2003.
19      I am going to be asking you some
20   questions regarding the construction project that
21   was taken place at 475 Ninth avenue and the
22   circumstances surrounding Mr. Santoli's accident.
23      If you don't understand my questions,
24   please let me know.
25      A.   Okay.
```

Page 7

```
 1                E. VENEZIA
 2      Q.   I will either repeat or rephrase the
 3   question.
 4      A.   Okay.
 5      Q.   If you do answer the question, I am
 6   going to assume that you understood it.
 7      Okay?
 8      A.   Okay.
 9      Q.   30 Waterside Plaza is your home
10   address; is that correct?
11      A.   Yes, it is.
12      Q.   What is your date of birth?
13      A.   9/ 19/ 48.
14      Q.   Are you currently employed?
15      A.   Yes.
16      Q.   Who are you employed by?
17      A.   VJB Construction.
18      Q.   What is your current job title?
19      A.   Vice president.
20      MR. RACH:   What was that?
21      THE WITNESS:   Vice president.
22      MS. HUANG:   I would like to go on the
23   record for a minute.  We are producing
24   Mr. Venezia for all of the defendants 475
25   Ninth Avenue, Kajima and VJB.
```

Page 8

```
 1                E. VENEZIA
 2      MR. PREMISLER:   How is that?
 3      MS. HUANG:   He is an authorized
 4   representative of all three of those entities.
 5      MR. ROSE:   Well, my suggestion is we
 6   take Mr. Venezia's deposition and we will
 7   determine whether or not there are additional
 8   depositions which will be necessary without
 9   waiving any objection to further depositions.
10      Okay?  Is that okay with you
11   counselor?
12      MS. HUANG:   I will take it under
13   advisement.
14      Q.   You said vice president, sir?
15      A.   Yes.
16      Q.   Of operations or is there something
17   specific?
18      A.   No.
19      Q.   Just vice president?
20      A.   Yes.
21      Q.   What are your duties and
22   responsibilities as vice president at VJB
23   Construction?
24      A.   I handle the construction coordination
25   of all of the jobs that we have.
```

2 (Pages 5 to 8)

Page 9

E. VENEZIA
1
2     Q.    How long have you held the title of
3   vice president?
4     A.    Approximately five years.
5     Q.    For that five year period of time, I
6   assume you were employed by VJB Construction?
7     A.    Yes.
8     Q.    During that five year period of time,
9   have you held any other title for VJB Construction?
10     A.    No, just vice president.
11     Q.    Okay. Prior to that five year period
12   of time, were you employed by VJB Construction,
13   were you employed by VJB or someone else?
14     A.    VJB Construction.
15     Q.    When did you begin your employment with
16   VJB Construction?
17     A.    Approximately ten years ago.
18     Q.    When you were hired by VJB who --
19   strike that.
20           When you were hired by VJB
21   Construction, what was your initial job title?
22     A.    Project manager.
23     Q.    Just briefly could you please tell me
24   what your duties and responsibilities as project
25   manager for VJB Construction were?

Page 10

E. VENEZIA
1
2     A.    I was assigned either one or two jobs
3   to handle all the paperwork correspondence,
4   requisitions, coordination between us and the
5   owner.
6     Q.    Okay. Did that work call for you being
7   physically present on construction sites?
8     A.    Sometimes.
9     Q.    Do your duties and responsibilities as
10   vice president at VJB require you to be present on
11   construction sites?
12     A.    Occasionally just not as much as a
13   project manager would be.
14     Q.    Generally speaking, what would the
15   purpose be for you to be on the construction site
16   in the scope of your duties as a vice president at
17   VJB?
18     A.    They were to have meetings where with
19   the owners and their representative to discuss the
20   project, the progress of the project and to review
21   requisitions and scheduling.
22     Q.    Now, actually before we get to this
23   project, could you just give me a brief synopsis of
24   your educational background?
25     A.    Sure.

Page 11

E. VENEZIA
1
2     Q.    Okay.
3     A.    I am a graduate architect from Long
4   Island University in 1971. I have been in the
5   construction business since 1967.
6     Q.    Okay. Outside of architecture, do you
7   have any education or training in the field of
8   construction?
9     A.    I have taken some HVAC courses, CPM
10   scheduling courses but nothing more than a couple
11   of weeks or whatever.
12     Q.    Okay. In the course of your employment
13   for VJB Construction, do you have any role in the
14   project that took place at 475 Ninth Avenue?
15     A.    Yes.
16           MS. HUANG: Objection but you can
17     answer.
18     A.    Yes.
19     Q.    What was your role in the project that
20   took place at 475 Ninth Avenue?
21     A.    I was a vice president with VJB that
22   was part of an entity of Kajima VJB LLC which ran
23   the project.
24     Q.    Can you explain to me what that means,
25   that you were vice president for VJB that ran an

Page 12

E. VENEZIA
1
2   entity known as Kajima?
3     A.    Well, what it is --
4           MS. HUANG: Objection. But it is
5     okay.
6     A.    What it is, I was the project exec on
7   that particular project. The title was vice
8   president but it was a project exec that
9   represented VJB, Kajima VJB LLC on this particular
10   project.
11     Q.    Okay. Who is the -- strike that.
12           Who was the owner of the property
13   located at 475 Ninth Avenue?
14     A.    I believe it was Dermot D-E-R-M-O-T.
15     Q.    Who is Dermot? Is that some sort of
16   ownership entity?
17     A.    Yes, it is an ownership entity.
18     Q.    Is that entity comprised or does it
19   have any relationship to either VJB or Kajima?
20     A.    I don't understand the question.
21     Q.    Okay. Are you familiar with the
22   principals of the company that you said was Dermot?
23     A.    Yes.
24     Q.    Who are those people?
25     A.    As far as I know, they were Bill Dicky

3 (Pages 9 to 12)

E. VENEZIA

1
2    MS. HUANG:   You keep saying VJB.
3    MR. ROSE:   Okay.
4    MS. HUANG:   Can you clarify from this
5  point forward?
6    MR. ROSE:   Well, you said that you
7  were producing him on behalf of all these
8  entities.
9    MS. HUANG:   Yes but the actual entity
10  you have to be accurate as to the entity.
11    MR. ROSE:   Okay.
12    Q.    Were these minutes after the minutes
13  were taken, were they later distributed at any
14  point?
15    A.    Yes.
16    Q.    And were they distributed to you in
17  addition to the other people who attended the
18  meetings?
19    A.    Yes, all of the attendants got copies.
20    Q.    Are these records that are kept in the
21  ordinary course of business by VJB Construction?
22    A.    They would be kept in the ordinary
23  business by Kajima/VJB LLC.
24    Q.    Okay.
25    A.    That entity.

E. VENEZIA

1
2    Q.    Where would they be kept?
3    A.    Probably be in archives at this point.
4    Q.    Okay. How often did these meetings
5  take place?
6    A.    They were sporadic.
7    Q.    Okay.
8    A.    Sometimes once a month, sometimes two
9  or three times a month.
10    Q.    Okay.
11    A.    Depending on items that we had to
12  discuss.
13    Q.    Okay.
14    A.    They also and I should interject they
15  were not always at the job site. They were at the
16  architects office as well.
17    Q.    Okay. Who is the architect on this
18  job?
19    A.    H. Thomas O'Hara.
20    Q.    Is that an office in Manhattan?
21    A.    Yes, it is.
22    MR. ROSE:   I am going to make a
23  request for the owner meeting minutes.
24    MS. TORNO:   I join in that request.
25    MR. RACH:   I join in.

E. VENEZIA

1
2    MR. PREMISLER:   I join in.
3    Q.    You stated also that you would attend
4  -- strike that.
5    You would go to the job site for
6  requisitions; is that correct?
7    A.    Yes.
8    Q.    What was the purpose for you going to
9  the job site for requisitions?
10    A.    I review the requisitions with our
11  superintendent whether they were correct as far as
12  work completed during the specific time period.
13    Q.    Were there schedules for this job?
14    A.    Yes.
15    Q.    For certain types of work to be
16  completed?
17    A.    Yes.
18    Q.    Who kept these schedules?
19    A.    The schedules would be kept by the LLC
20  as well as being incorporated in some of the
21  contracts.
22    Q.    Okay. When you say the LLC, you are
23  referring to the joint?
24    A.    Kajima.
25    Q.    The joint venture?

E. VENEZIA

1
2    A.    Yes, Kajima VJB, LLC.
3    Q.    Would those schedules also be in
4  archives right now?
5    A.    Yes.
6    MR. ROSE:   I am going to make a
7  request for the any construction schedule
8  records of construction schedules that were
9  made by the joint venture of Kajima and VJB.
10    MS. TORNO:   I join in that request.
11    MR. RACH:   I join in.
12    MR. PREMISLER:   I think we all do.
13    Q.    Was there a general contractor on this
14  job?
15    A.    No, the LLC Kajima/VJB LLC was the
16  construction manager.
17    Q.    Okay. Generally speaking, what were
18  the duties and responsibilities of the joint
19  venture as construction manager of this project?
20    A.    We would coordinate the work with all
21  of the subcontractors.
22    Q.    Did that role also include hiring the
23  subcontractors to perform work on the site?
24    A.    Yes, we would have a contract with the
25  subcontractors which actually would be signed by

Page 25

E. VENEZIA

1   E. VENEZIA
2   the owner and the construction manager.
3   Q.   Is that --
4   A.   Which is the LLC.
5   Q.   Okay.
6   A.   Yes.
7   MR. PREMISLER:   When you keep saying
8   LLC, you are referring to the joint venture?
9   THE WITNESS:   Referring to Kajima VJB
10   Construction, LLC.
11   MR. PREMISLER:   Okay.
12   Q.   Did the joint venture as construction
13   manager also have a role as far as site safety was
14   concerned?
15   A.   We have the LLC, Kajima VJB
16   Construction services LLC has a site safety plan
17   that's attached to every subcontractor's contract.
18   Q.   Is that a standard form that's attached
19   to every single subcontractor's contract?
20   A.   Yes, it is.
21   Q.   I notice that you are looking at a
22   document right now.
23   A.   This is a --
24   Q.   Why don't we mark that?
25   MR. ROSE:   Okay.  Mark this as

Page 26

1   E. VENEZIA
2   Plaintiff's Exhibit 2.
3   (Whereupon, the aforementioned document
4   was marked as Plaintiff's Exhibit 2 for
5   identification as of this date by the
6   Reporter.)
7   MR. ROSE:   Off the record.
8   (Whereupon, an off-the-record
9   discussion was held.)
10   Q.   I am going to ask you to take a look at
11   what has been marked as Plaintiff's Exhibit 2 for
12   identification.
13   A.   Yes.
14   Q.   Do you recognize that document?
15   A.   Yes.
16   Q.   What is that?
17   A.   It is a contract between R and J
18   Construction subcontractor for dry wall, the owner
19   and Kajima VJB Construction Services, LLC.
20   Q.   Is that a record that's kept in the
21   ordinary course of business by VJB Construction?
22   A.   It is kept as an ordinary of business
23   by Kajima/VJB Services LLC.
24   Q.   Okay.  The joint venture?
25   A.   Yes.

Page 27

1   E. VENEZIA
2   Q.   You were referring earlier to something
3   called the site safety plan?
4   A.   Yes.
5   Q.   Is that contained within the document
6   that has been marked as Plaintiff's Exhibit 2 for
7   identification?
8   A.   Yes, it is.
9   Q.   Could you show me where it is?
10   A.   (indicating).
11   Q.   Okay.
12   MR. PREMISLER:   Off the record.
13   (Whereupon, an off-the-record
14   discussion was held.)
15   MR. ROSE:   For the record, the site
16   safety plan is marked Exhibit F at the top of
17   the document on Plaintiff's Exhibit 2 for
18   identification and the first page also states
19   on the bottom 1 of 5.
20   Q.   Generally speaking, does the site
21   safety plan designate responsibility, safety
22   responsibility on the site to any particular entity
23   or entities?
24   A.   Yes, this particular safety plan and I
25   marked it indicates that they should, they meaning

Page 28

1   E. VENEZIA
2   the subcontractor is responsible for a site safety
3   coordinator that's employed by him.
4   Q.   Him being?
5   A.   Him being the subcontractor.
6   Q.   Okay.
7   A.   It also states what responsibility he
8   has for having meetings with the LLC.  It also
9   states that they are responsible.
10   Q.   When you say meetings with the LLC,
11   what specifically are you referring to?
12   A.   We are referring to is we had weekly
13   meetings with a representative for from the
14   subcontractor, each subcontractor to discuss any,
15   to make sure that the subcontractors are following
16   the site safety plan that we attached to their
17   contract.
18   Q.   Okay.  And did you attend these weekly
19   meetings?
20   A.   No, I do not.
21   Q.   Who would attend the weekly meetings?
22   A.   The site safety manager of the LLC.  At
23   this, I forget his name.  I believe it was either
24   Jessy Jackson or a guy by the name of Wall.
25   Q.   Gary Wall?

Page 113

E. VENEZIA

1
2  moved from one floor to another?
3      A.    No.
4          MS. HUANG:  Objection.
5      Q.    As of April 2, 2003, are you aware of
6  whether there were any containers on the top floor
7  of the project?
8      A.    No, I am not aware.
9      Q.    Would there be any records kept as to
10  where the containers would have been located on any
11  particular day?
12      A.    No.
13      Q.    When was the last time on or before
14  April 2, 2003, that Spieler and Ricca performed any
15  work on the top floor of the project?
16      A.    I don't know.  I would have to check
17  the records.
18      Q.    What records would you check to answer
19  that question?
20      A.    The daily field reports.
21      Q.    That's the daily reports we have spoken
22  of earlier?
23      A.    Yes.
24      Q.    What would be reflected on the daily
25  reports to indicate what contractor, if any, did

Page 114

E. VENEZIA

1
2  work on the top floor of the project on April 2,
3  2003?
4      A.    It would list the contractors.  It
5  would list how many people they had working for
6  them or foreman, the journeyman, it would usually
7  list the areas where they were working.  They might
8  list tenth floor, twelfth floor, whatever floor
9  they were on.
10      Q.    In general what stage was the
11  construction at as of April 2, 2003?
12      A.    I would have to check.  I don't
13  remember.
14      Q.    What would you check?
15      A.    I would check again, once again the
16  daily field reports.
17      Q.    Okay.
18      A.    I would have to check the requisitions
19  to see which previous monies they had gotten paid.
20      Q.    As of April 2, 2003, how many floors of
21  the project had received either a TCO or a CO?
22      A.    I don't know.
23      Q.    Had any floors received the TCO or a CO
24  of as of April 2, 2003?
25      A.    I would have to check.  I don't recall.

Page 115

E. VENEZIA

1
2      Q.    Again, what would you check?
3      A.    I would have to check the dates of the
4  TCO.
5      Q.    Who was in -- withdrawn.
6          Was there a foreman for the laborers?
7      A.    Yes.
8      Q.    Who was that?
9      A.    I believe it was Sammy Denny.
10      Q.    What is the basis of your testimony
11  that Mr. Denny was the foreman?
12      A.    I checked -- again, once again I would
13  have to check the payroll records or the time
14  sheets but I believe it was Sammy.
15      Q.    Was there only one laborer foreman
16  during the life?
17      A.    Yes.
18      Q.    Of this project?
19      A.    Yes.
20      Q.    Did the laborer foreman have any duties
21  or responsibilities to provide anything in writing
22  on a daily or weekly basis to the LLC?
23      A.    No.
24      Q.    Do you know who employs Mr. Denny at
25  the current time?

Page 116

E. VENEZIA

1
2      A.    VJB.
3      Q.    What is his job now?
4      A.    He is the laborer foreman at another
5  particular job site.
6      Q.    Do you know approximately the
7  completion date for this project?
8      A.    I don't recall.  I would have to check
9  to see what the schedule said.
10      Q.    Can you give me an approximation?
11      A.    I can't.  It is too long ago.
12      Q.    Okay.
13      A.    Many jobs ago.
14      Q.    Was there anyone else from the joint
15  venture present at this job site on a daily or
16  weekly basis in a managerial capacity other than
17  the project manager, the superintendent, the
18  assistant superintendent and the laborer foreman?
19      A.    No, not from the LLC on the job site.
20      Q.    Okay.
21      A.    Continually, no.
22      Q.    Would there be anyone in a direct
23  employ of VJB on the job site?
24          MS. HUANG:  Objection.
25      A.    They would be under the LLC Kajima/VJB

29 (Pages 113 to 116)

Page 117

E. VENEZIA

1  LLC.
2
3     Q.    So there wouldn't be anyone else that
4  you haven't testified with regard to who may have
5  been a direct employ of Kajima or VJB or 457 Ninth?
6        MS. HUANG:   Objection.
7     A.    There, it is under a joint venture
8  agreement that we did this job.
9     Q.    Okay.  So I am just trying to make sure
10 that there wouldn't be anyone there from VJB who
11 wasn't part of the joint venture or who are any
12 duties or responsibilities with regard to this
13 project?
14    A.    Again, it would be under the joint
15 venture.
16    Q.    The same is true with Kajima?
17    A.    That would be under the joint venture.
18 That's whoever was hired to do, there was Kajima
19 and VJB personnel who formed the joint venture.
20       MR. PREMISLER:  I am sorry.  I missed
21 half of that.
22       THE WITNESS:  Kajima and VJB is a
23 joint venture and the people who were assigned
24 on that job were assigned to the joint
25 venture.

Page 118

E. VENEZIA

1
2        MR. PREMISLER:   So everyone was
3  employed by the joint venture.
4        THE WITNESS:  Yes.
5        MR. SANCHEZ:   They were paid by the
6  joint venture?
7        THE WITNESS:  They were paid by the
8  joint venture.
9        MR. CASTELLANO:  I have no further
10 questions at this time.  Thank you.
11 EXAMINATION BY
12 MR. SANCHEZ:
13    Q.    Mr. Venezia, my name is Robert
14 Sanchez.  I represent the Defendant Regional
15 Scaffolding and Hoisting Company.
16       We are from the law firm of Frank
17 Wright and Associates.
18       Where was 475 Ninth Avenue located the
19 building itself?
20    A.    Ninth Avenue and 37th Street.
21    Q.    Was it on the corner?
22    A.    It was on the north west corner.
23    Q.    Was the front of the building, the
24 front of the building facing Ninth avenue?
25    A.    No, the entrance to the building was on

Page 119

E. VENEZIA

1
2  47th Street.
3        MR. CASTELLANO:   Off the record.
4        (Whereupon, an off-the-record
5  discussion was held.)
6     Q.    What was the shape of the building?
7     A.    I think it was like a U shape type of
8  building.
9     Q.    Okay.
10    A.    With a court yard.
11    Q.    Okay.  When you say U shaped, where
12 were the prongs of the U facing?
13    A.    They were facing west.
14    Q.    Can you tell me what Regional
15 Scaffolding and Hoisting did at the site?
16    A.    I am sorry.  I didn't hear you.
17    Q.    Can you tell me what Regional
18 Scaffolding and Hoisting did at the site?
19       MS. HUANG:   Objection.
20    A.    They proceeded the rack and pinion, the
21 dual rack and pinion hoist as well as the sidewalk
22 bridge.
23    Q.    Anything else?
24    A.    Not to my knowledge.
25    Q.    Can you describe the rack and pinion

Page 120

E. VENEZIA

1
2  hoist, please?
3     A.    It is a dual exterior elevated that
4  ride on the track.  It is two cars that go up on
5  and down on the track.
6     Q.    So there is one tower?
7     A.    Yes.
8     Q.    Two hoist cars on the tower?
9     A.    Yes.
10    Q.    Was one designated as material hoist,
11 one passenger hoist?
12    A.    Yes.
13    Q.    Where was the tower located?
14    A.    It was on 37th Street.
15    Q.    So in the front of building; correct or
16 what would be the front of the building?
17    A.    Approximately twenty feet off the
18 northwest corner.
19    Q.    Did the front of the building extend
20 all the way to the curb or was it set back?
21    A.    It was set back from the sidewalk.
22    Q.    How far was it set back?
23    A.    Approximately ten feet.
24    Q.    Generally did Regional do any work on
25 the interior of the building?

30 (Pages 117 to 120)

Page 121

E. VENEZIA

1
2       MS. HUANG:   Objection.
3       Q.    All of its work was performed on the
4  outside of the building?
5       A.    As far as I know, yes.
6       Q.    Did the building as constructed contain
7  elevators?
8       A.    Yes.
9       Q.    Where were the elevators located?
10      A.    They were located off the entrance on
11  37th Street, you go through a lobby and it is off
12  to the left a little.
13      Q.    To the left of the entrance?
14      A.    Yes.
15      Q.    How many elevators were there at that
16  spot?
17      A.    I believe two.
18      Q.    Were there any other elevators in the
19  building?
20      A.    I don't remember. I know those would.
21  I don't know. There was another elevator and it
22  served the garage. I don't know if there was
23  another service elevator or not. I have to look at
24  the number.
25      Q.    The other elevator that serviced the

Page 122

E. VENEZIA

1
2  garage, where was that situated?
3      A.    That was in the garage area.
4      Q.    Where is the garage area?
5      A.    To the end of 37th Street.
6      Q.    When you say the end of 37th Street,
7  are you talking about east or west?
8      A.    I am talking west.
9      Q.    So the western most part of the
10  building off 37th Street is where the garage is; is
11  that correct?
12      A.    Correct.
13      MR. SANCHEZ:   Off the record.
14      (Whereupon, an off-the-record
15      discussion was held.)
16      MR. SANCHEZ:   Back on the record.
17      Q.    Just to clarify the discussion that we
18  had off the record, we will go back, you wanted to
19  change one of your answers about where the building
20  was located.
21      Was it on the southwest corner?
22      A.    Yes, it is on the southwest corner. I
23  am sorry. Not the north west.
24      Q.    Thank you very much.
25      A.    Okay.

Page 123

E. VENEZIA

1
2      Q.    Do you know when the elevators were
3  functioning, when the elevators began to function
4  in the building?
5      A.    The interior elevators?
6      Q.    The interior elevators.
7      A.    I would have to check to see when.
8      Q.    Is it safe to say that they were
9  functioning prior to when the temporary certificate
10  of occupancy would have been issued?
11      A.    Yes, I need the final was on the
12  elevators prior to issuance of a temporary
13  certificate of occupancy.
14      Q.    Plaintiff testified that an temporary
15  certificate of occupancy was already for certain
16  parts of the building; as we sit here today, do you
17  have any basis for disputing that?
18      A.    No, I would have to check to see if
19  that were true.
20      Q.    Can you tell me what BX cable is?
21      MS. HUANG:   Objection.
22      A.    BX cable, is my understanding it is
23  flexible cable that has wire in it that gets fed to
24  outlets and switches.
25      Q.    Do you know whether the BX cable was

Page 124

E. VENEZIA

1
2  used at the site?
3      A.    Whether it was used?
4      Q.    Yes.
5      A.    Yes, it was used by the electricians,
6  too.
7      Q.    For what purpose?
8      A.    For electrical outlets and switches
9  within the inside of the stud.
10      Q.    Would any of the other subcontractors
11  would have been using-- excuse me. Withdrawn.
12      Would any of the other parties or
13  entities at the site use BX cable at the site?
14      MS. HUANG:   Objection.
15      A.    Not that I know of. Only the
16  electricians would be using it.
17      MR. CASTELLANO:   Objection to form.
18      MR. ROSE:   Was Spieler and Ricca the
19  only electrical subcontractors on the site?
20      THE WITNESS:   Yes.
21      MR. ROSE:   Okay.
22      Q.    Did there come a point in time where
23  the hoist was dismantled at the site?
24      A.    Yes.
25      Q.    When was that?

31 (Pages 121 to 124)

Page 125

E. VENEZIA

1
2     A.    I would have to check the records of
3  when it came down. I don't know.
4     Q.    Would the hoist have been dismantled
5  prior to the issuance of temporary occupancy for
6  the site?
7     A.    No.
8     Q.    Do you recall when the exterior walls
9  were fully erected and finished at the site?
10    A.    No.
11    Q.    Would the exterior walls been finished
12 prior to the temporary certificate occupancy?
13    A.    All of the interior walls would have
14 been done to where the hoist was located.
15    Q.    The plaintiff testified at his
16 deposition that the hoist was dismantled in March
17 of 2003; as we sit here today, do you have any
18 reason to dispute that?
19        MS. HUANG:  Objection.
20    A.    No.
21    Q.    Again, Regional's records that we
22 turned over their daily schedule indicates that the
23 hoist was dismantled in March of 2003, do you have
24 any basis to dispute that as we sit here today?
25    A.    No.

Page 126

E. VENEZIA

1
2     Q.    When you would visit the site, would
3  you walk the site?
4         MS. HUANG:  Objection.
5     A.    Yeah, I would walk through the
6  building.
7     Q.    Would you walk through the floor to
8  take a look at the conditions and the progress that
9  was going on at the site?
10    A.    Not necessarily every floor. I would
11 spot, the check the areas. Again, the
12 requisitions, I would have to verify what work was
13 being done with the superintendent. If I had a
14 question, I would ask him and we would take the
15 hoist up and take a look.
16        MR. ROSE:  Before you move on, can I
17    ask one question?
18        MR. SANCHEZ: Sure.
19        MR. ROSE:  After the hoist was removed
20    from the site, how was debris removed from the
21    site?
22        THE WITNESS:  Through the interior
23    elevators.
24        MR. ROSE:  Through the interior
25    elevators?

Page 127

E. VENEZIA

1
2         THE WITNESS:  Yes.
3         MR. ROSE:  Was that done by the LLC
4    laborers?
5         THE WITNESS:  Yes.
6         MR. ROSE:  Okay. Thank you.
7     Q.    Do you know whether any subcontractors
8  stored material on the top floor?
9         MS. HUANG:  Objection.
10    Q.    Of the building?
11    A.    No, I don't know.
12    Q.    Do you know whether Regional had
13 anything to do with the top floor, the inside of
14 the top floor of the building?
15        MS. HUANG:  Okay.
16    A.    No. Regional just provided like I said
17 previously the hoist and the sidewalk bridge, not
18 material.
19    Q.    Was Regional on site after the
20 installations were completed?
21    A.    No.
22        MR. SANCHEZ: I have nothing further.
23    Thank you.
24 EXAMINATION BY.
25 MR. PREMISLER:

Page 128

E. VENEZIA

1
2     Q.    Good afternoon. My name is Andrew
3  Premisler. I represent Third-party Defendants
4  Travelers Indemnity Company in this action.
5     I am going to ask you just a couple of
6  follow up questions.
7     A.    Okay.
8     Q.    Do you have any personal knowledge of
9  when, if at all, VJB Construction requested
10 insurance coverage from Travelers in connection
11 with Mr. Santoli's alleged accident?
12        MS. HUANG:  Objection. If he knows.
13    A.    It wouldn't be VJB. It would be the
14 Kajima VJB that ran the job. I don't know if any
15 other.
16    Q.    Why do you say that?
17    A.    Because that's the entity that did the
18 job.
19    Q.    Okay.
20    A.    I don't know if VJB IS a separate
21 company different applied for insurance through
22 Travelers. I wouldn't know.
23    Q.    Okay. Did VJB construction Corp. do
24 any work at all on this project?
25    A.    It was all done through Kajima/VJB LLC.

32 (Pages 125 to 128)

Page 129

E. VENEZIA

1
2    Q.    So VJB Construction Corp. itself didn't
3  do any work?
4    A.    That's correct.
5    Q.    The same no one would have done any
6  work for VJB construction Corp. on this project?
7    A.    No.  It would all be done through the
8  LLC.  That's what the contracts all with.
9    Q.    What about for Kajima Development
10 Corporation, do you know who Kajima Development
11 Corporation is?
12       MS. HUANG:   Objection.
13    A.    No.  I don't know what Kajima
14 Development Corporation is.
15    Q.    Are you appearing here today on behalf
16 of an entity known as Kajima Development
17 Corporation?
18    A.    Kajima Construction Services I think it
19 was.
20    Q.    So you are not appearing here today on
21 behalf of Kajima Development Corporation?
22    A.    I don't know.  They could be one in the
23 same.
24    Q.    Do you have any knowledge of?
25    A.    No.

Page 130

E. VENEZIA

1
2    Q.    What, if any, relationship there is
3  between Kajima development Corporation and Kajima
4  Construction Services?
5    A.    No.
6    Q.    Okay.
7    A.    I don't have any personal knowledge.
8    Q.    Do you know who Kajima Construction
9  Services is?
10    A.    They are our joint venture partner on
11 this particular job.
12    Q.    At the time of this project, did you
13 work for Kajima Construction Services?
14    A.    No.
15    Q.    Have you ever been employed by Kajima
16 Construction Services?
17    A.    No, I have not.
18    Q.    Have you ever been employed by Kajima
19 Development Corporation?
20    A.    No, I have not.
21    Q.    Have you ever been employed by 475
22 Ninth Avenue Associates LLC?
23    A.    No.
24    Q.    Have you ever been employed by Dermot
25 Meridien, LLC?

Page 131

E. VENEZIA

1
2    A.    No.
3    Q.    Is that the company you referred to
4  earlier as Dermot?
5    A.    Yes.
6    Q.    Does that refresh your recollection?
7    A.    Yes.
8    Q.    Are you aware, do you have any personal
9  knowledge at all about any requests for coverage
10 made on behalf of the joint venture Kajima/ VJB to
11 Travelers?
12    A.    No.
13    Q.    Who would know anything about that, if
14 you know?
15    A.    I don't know.
16    Q.    Okay.  Was there anybody working at the
17 time of this project or since then who would have
18 any knowledge about any requests for coverage made
19 by that joint venture in connection with this
20 project?
21    A.    Not that I know of.
22    Q.    Who would have that information?
23    A.    I don't know.
24    Q.    You mentioned earlier that there was a
25 secretary who works for VJB now and her name?

Page 132

E. VENEZIA

1
2    A.    Jennifer Fernandez.
3    Q.    Right.  You mentioned earlier that she
4  was involved or has some job responsibilities in
5  connection with insurance claims; is that correct?
6    A.    What she would do for, not insurance
7  claims for example lawsuits.
8    Q.    Okay.
9    A.    Everything would go to her.  She would
10 make me aware of, for example, today that I would
11 have to come and anything that the lawyers might
12 ask for would go through her.  I mean they call me
13 and I refer them to her.
14    Q.    So she would have no responsibilities
15 in connection with making any claims for requests
16 for coverage to insurance companies themselves?
17    A.    No.
18    Q.    In connection with this or any other
19 project?
20    A.    Right.
21    Q.    Is there anybody currently employed by
22 VJB Construction that would have such
23 responsibility?
24    A.    Not that I'm aware of.
25    Q.    Okay.  Do you have any personal

33 (Pages 129 to 132)